(No. 18801.—

THE PEOPLE *ex rel.* The Illinois State Bar Association *et al.* Relators, *vs.* THE PEOPLES STOCK YARDS STATE BANK, Respondent.

*Opinion filed June 18, 1931.*

JOHN L. FOGLE, (RUSH C. BUTLER, CARL R. LATHAM, R. ALLAN STEPHENS, HERBERT M. LAUTMANN, JOHN F. VOIGHT, ALONZO HOFF, CHARLES O. LOUCKS, FRANKLIN L. VELDE, and SIDNEY S. GORHAM, of counsel,) for relators.

MITCHELL D. FOLLANSBEE, and ROBERT W. SCHUPP, (PAUL D. MILLER, of counsel,) for respondent.

HORACE KENT TENNEY, and PERCY B. ECKHART, *amici curiæ.*

Mr. JUSTICE ORR delivered the opinion of the court:

This is an original proceeding instituted in this court by information in the name of the People, on the relation of the Illinois State Bar Association and the Chicago Bar Association, against the Peoples Stock Yards State Bank, a banking corporation of Illinois, as respondent, seeking to have respondent punished for contempt of this court for engaging in the practice of law and also to enjoin it from continuing such practice. Leave to file the information having been granted, a rule was entered requiring the respondent to answer. It filed its answer, and the cause was then referred to Thomas J. Holmes, a master in chancery of the superior court of Cook county, as commissioner of this

court, to take the evidence and report his conclusions of fact and law. The commissioner heard the evidence and submitted his report, recommending that relief be granted as prayed in the information. Objections of respondent to the report were overruled and by stipulation of the parties it was agreed that those objections should stand as exceptions in this court. After the filing of the report briefs were filed on behalf of both parties. On motion of the Corporate Fiduciaries Association of Chicago and the Illinois Bankers Association leave was granted to Horace Kent Tenney to file a brief as *amicus curiæ,* and subsequently leave was also granted to Percy B. Eckhart to file a brief as *amicus curiæ.*

In his report the commissioner finds the facts substantially as follows: Respondent is a duly organized bank under Illinois laws and has complied with the laws of this State with respect to trust companies. Its place of business is at South Ashland avenue and West Forty-seventh street, in the city of Chicago. That location is a community center, mostly of citizens of foreign birth employed as industrial workers. The bank has about 2500 checking accounts and 40,000 depositors in the savings department. About seventy-five per cent of the customers of the bank are of foreign birth and some do not speak the English language fluently. The banking institution has not only the usual commercial departments of a modern bank but also a trust department, a real estate department in which through duly licensed lawyers it transacted for its customers and others almost every form of legal business except the handling of divorce cases. The officers of the bank at various times conducted what they called "drives" in order to secure new customers for the bank. The drives were conducted through personal solicitation, by telephone and circular letters or other forms of advertising. It was largely employees of the bank who engaged in this work of securing new business. Prizes of different values were awarded

to those securing new business. Prizes were given to those securing new deposit accounts. Other prizes were given for procuring persons who by wills or other legal documents would name the bank as executor or trustee or who would employ the services of the bank in other ways. The bank performed the legal services necessary in the administration of estates in the probate court of Cook county. It acted as executor or administrator in various estates, as conservator for distracted persons and as guardian for minors, and through its legal department performed legal services with reference to such estates, charging the usual fees for such services. In addition thereto, by the use of the name of either Edward J. Warren or Emanuel Nylin, or other attorneys in its employ, it collected and appropriated to its own use the fees which were allowed by the probate court of Cook county for such legal services. From 1924 to April, 1927, respondent had on its books, and handled, an average of about 200 estates in the probate court each year. There is no evidence relating to these matters prior to 1924, nor was the commissioner able to determine or approximate the actual amount of attorneys' fees which the bank received and appropriated for legal services from 1924 to 1927. The books of the bank would undoubtedly disclose these amounts. Although a demand was served on counsel for respondent to produce such books and records, it failed to comply with the demand except as to a single account carried under the name of Edward J. Warren, an attorney in its employ, covering a period of slightly more than the year 1925. Respondent also during the same period and through its legal department conducted a number of foreclosure proceedings in the circuit and superior courts of Cook county. In most of such proceedings it was the owner of the loans secured by the trust deeds being foreclosed, but in a number its customers or clients were the owners of the loans. In cases where the bank was the owner of the loans and the complainant in such foreclosure

proceedings, through its legal department it proved up and was allowed the usual and customary solicitor's fees by the circuit and superior courts and appropriated to its own use all such solicitor's fees allowed. Such proceedings were conducted in the name of Edward J. Warren or Emanuel Nylin as the attorney for the complainant therein, but these attorneys did not receive directly any part of the fees allowed to them as such solicitors. It does not appear that the respective courts and masters in chancery thereof before whom the proofs were taken, and the parties to the litigation, were at any time informed of the foregoing facts. In cases where such foreclosure proceedings were conducted by the bank on behalf of its customers and clients the fees allowed by the circuit and superior courts to the solicitor appearing of record on behalf of the complainant were collected and appropriated by the bank. The same conditions existed in this class of proceedings as existed with reference to such proceedings where the bank, as trustee or otherwise, was a party. Its books and records, if produced, would probably show the amounts actually allowed as solicitor's fees in such cases and received and appropriated by it to its own use, but it has failed to produce such books or information notwithstanding demand therefor was made upon it. For this reason the commissioner was unable to ascertain exactly the amounts of money so received and appropriated by respondent.

Joseph Wojnowski, an attorney employed in the bank from October 1, 1922, to December 31, 1925, was called as a witness by relators. The commissioner found him to be responsible, reliable and trustworthy, and on the basis of his testimony found that the number of foreclosure proceedings in which the bank participated during the years 1923 to 1925 was from eight to ten each month, but the witness was unable to state the total amount of attorney's fees received by respondent for such services during those years. During the same period of time respondent followed

the practice, through its legal department, of drafting and attending to the execution of wills for its clients and customers. Charges were made for such services ranging from $5 to $25 or more. The number of wills so drawn amounted to 150 or 200 each year during the three-year period of Wojnowski's employment as an attorney by the bank. He testified that in performing such services he was instructed by the officers of the bank to endeavor to have the bank named as executor, and that in the event it was so named he was instructed to make no charge for his services in drafting and attending to the execution of the wills but that otherwise an appropriate charge was to be, and was, made. The bank failed to produce its books and records, and the commissioner was therefore unable to determine from the evidence the total number of wills drawn by the bank or the amount received by it as attorney's fees for such services.

Respondent also during the same period of time, through its legal department, handled and conducted for its customers and clients all the details of various real estate transactions where real estate was bought, sold, exchanged or otherwise dealt in, including not only those set out in detail in the information herein but a large number of other deals of similar character. In these real estate transactions the bank, through its legal department, would interview the parties, ascertain the figures and conclusions at which they had arrived and draft and attend to the execution of the contracts for the sale or exchange of the real estate. It would attend to the bringing down of abstracts and guaranty policies, examine such abstracts and policies and render opinions of title thereon, using the name, usually, of Edward J. Warren on such opinions. It would attend to all the details of clearing the title to the real estate involved, either in exchange or sale, including the preparation and execution of affidavits when necessary to clear up defects, and would draft and attend to the execution and recording

of all necessary deeds, mortgages, trust deeds and other documents between the parties interested. It would conduct the negotiations between the parties at the closing of the deals in which it is customarily necessary. It would also adjust all differences between the parties with reference to taxes, insurance, rents and other charges and allowances, and during these transactions it gave to the parties such legal advice as was sought, frequently representing both sides of a transaction. For these services for many years it made and collected a charge of approximately from $5 to $10 for the drafting of a contract of sale or exchange, $20 to $25 for the rendition of an opinion of title and $10 to $20 for the other services, including the drafting, execution and delivery of deeds, mortgages, trust deeds and other title papers. The proof shows that between the years 1921 and 1926, inclusive, such transactions numbered approximately 200 per year. The fees collected by the bank for these services rendered by its officers and employees were appropriated by the bank to its own use. Respondent also during the same period of time drafted or caused to be drafted in its legal department, for its customers, many other legal papers, consisting of deeds containing covenants to stand seized to the use of the grantor, contracts and agreements with regard to various kinds of easements, building contracts and contracts for the erection of houses, garages and other buildings, chattel mortgages of any kind, house and apartment leases, and many other legal documents. The bank charged and collected fees for such services, the amount of which the commissioner was unable to estimate or approximate. In the conduct of all of the business above referred to, the bank collected large amounts from year to year. One witness testified that the bank's income from this source for 1924 was about $14,000. Respondent produced the account of Edward J. Warren, one of the attorneys in its employ. This account was introduced in evidence by relators and showed the receipts of the bank from

this business were $20,239.97 from January 1, 1925, to March 6, 1926. Such an account undoubtedly was kept by the bank for other years but was not produced. The commissioner, on the basis of the evidence, found that the receipts of the bank in conducting its legal department during the years 1924 to 1926, inclusive, were in excess of $14,000 per year.

About November 1, 1926, the attention of the officials of respondent was directed to the question of the unauthorized practice of law by corporations, including banks and trust companies, in this State, by a letter from a committee of the Illinois State Bar Association. Respondent claimed that since that time it has entirely ceased the practices above referred to. Upon this subject the commissioner found that the bank did not cease such practices but organized a purported law firm, using the names of three young lawyers in its employ and paying them fixed salaries, and that from the middle of November, 1926, to April, 1927, during the existence of this law firm, the bank continued the practices above referred to. It claimed that after April 1, 1927, it entirely ceased all such practices, so far as they might be held to constitute practicing law; but in this regard the commissioner found that it continues to handle for its customers and clients all the legal details of real estate sales and exchanges and charges and collects fees therefor as previously. He also found it has ceased to render or charge for opinions of title, but that it still continues to prepare deeds, mortgages, trust deeds, contracts of sale and other contracts with respect to real estate, chattel mortgages, building contracts, leases of real estate and documents of that nature and charges and collects fees therefor, but that it has ceased to draft wills or act as attorney in the probating of estates or to collect attorney's fees allowed in foreclosure cases.

It is contended by respondent that this court has no jurisdiction to entertain an original proceeding of this na-

ture; that respondent's participation in the proceedings in the trial courts did not constitute a contempt of this court; that the legal services which respondent performed outside of court did not constitute a contempt of any court, whether such services amounted to practicing law or not, and that prior to the filing of the information it had ceased to perform services as might constitute practicing law, and therefore should not be punished for its prior conduct. The *amici curiæ* also question the jurisdiction of this court to entertain this proceeding or to grant the relief prayed in the information.

Under the constitution of this State the judicial power is vested solely in the courts. (Const. art. 6, sec. 1, and art. 3; *Missouri River Telegraph Co.* v. *First Nat. Bank,* 74 Ill. 217; *In re Day,* 181 id. 73.) Included in this grant are all powers necessary for complete performance of the judicial functions. (*State of Illinois* v. *Illinois Central Railroad Co.* 246 Ill. 188.) Although the constitution does not expressly confer upon this court power and jurisdiction with respect to the admission of attorneys to practice law, such power and jurisdiction are necessarily implied and are inherent in this court. (*In re Day, supra.*) As a part of such inherent power this court may not only determine the educational and moral qualifications of applicants for admission to the bar but may also discipline or disbar attorneys for misconduct. (*People* v. *Chamberlain,* 242 Ill. 260; *People* v. *Czarnecki,* 268 id. 278.) Attorneys are officers of this court and their conduct as such is subject to supervision by it. They are, in effect, a part of the judicial system of the State. (*In re Day, supra; People* v. *Czarnecki, supra; Ex parte Secombe,* 19 How. 9; *Ex parte Wall,* 107 U. S. 265.) The power to prescribe the qualifications which will entitle an applicant to be admitted to the bar is judicial, as is also the power to discipline or disbar attorneys for professional misconduct either in court proceedings or their relations with clients outside of court. (*People* v. *Macauley,*

230 Ill. 208; *People* v. *Meyerovitz,* 278 id. 356.) The respective functions and powers of the courts and the legislature in this State as to who shall be permitted to practice law and in fixing the qualifications for admission to the bar were considered at great length in *In re Day, supra,* and need not be again announced.

The challenge of the jurisdiction of this court to entertain this original proceeding is based upon section 2 of article 6 of the constitution of this State, which provides that this court "shall have original jurisdiction in cases relating to the revenue, in *mandamus* and *habeas corpus,* and appellate jurisdiction in all other cases." It is said that this court cannot exercise original jurisdiction in any case other than the three thus mentioned in the constitution. With this contention we cannot agree. Since its inception this court has exercised original jurisdiction of proceedings relating to the admission and disbarment of attorneys, and although the constitutional provision above referred to does not mention these subjects, the original jurisdiction of this court over such matters has never been questioned. This court has exercised original jurisdiction of applications for admission to the bar of this State *(In re Day, supra,)* and in numerous cases has entertained original proceedings for disbarment. It is argued that this proceeding is not of that character; that the exercise by this court of original jurisdiction to disbar an attorney is based upon the fact that the attorney is an officer of the court, and so this court obtains jurisdiction over him by virtue of having licensed him to practice as such, whereas the court acquires no such jurisdiction with respect to persons who are not so licensed. We believe such a contention is entirely untenable. Having inherent and plenary power and original jurisdiction to decide who shall be admitted to practice as attorneys in this State, this court also has all the power and jurisdiction necessary to protect and enforce its rules and decisions in that respect. Having power to determine who shall and who

shall not practice law in this State, and to license those who may act as attorneys and forbid others who do not measure up to the standards or come within the provisions of its rules, it necessarily follows that this court has the power to enforce its rules and decisions against offenders, even though they have never been licensed by this court. Of what avail is the power to license in the absence of power to prevent one not licensed from practicing as an attorney? In the absence of power to control or punish unauthorized persons who presume to practice as attorneys and officers of this court the power to control admissions to the bar would be nugatory. And so it has been held that the court, which alone has authority to license attorneys, has as a necessary corollary ample implied power to protect this function by punishing unauthorized persons for usurping the privilege of acting as attorneys. (*In re Morse,* 98 Vt. 85, 126 Atl. 550.) In *People* v. *Czarnecki,* (No. 8901, April term 1913, no opinion,) this court in effect recognized the principle that a person not having a license from this court to practice as an attorney is guilty of contempt of this court in practicing as an attorney in a trial court. In that case an attorney, after he had been disbarred by this court, (268 Ill. 278,) appeared and acted as an attorney in the circuit court of Cook county, and a rule was entered by this court requiring him to show cause why he should not be attached for contempt of this court for presuming to act as attorney at law in defiance of the order of this court disbarring him from practice. The fact that the rule in that case thus referred to the previous order of disbarment does not necessarily affect its application here.

Respondent also asserts that while this court has jurisdiction to entertain a proceeding to punish an unlicensed individual for appearing and practicing in this court it has no such jurisdiction or power over one who has been guilty of unauthorized practice of law by appearing in the trial courts of this State. No doubt each trial court in this State

has ample authority to punish as for contempt of that court any person who presumes to appear and.act as an attorney in that court without having been licensed by this court. But it does not follow that the jurisdiction of the trial court is exclusive in that respect. While the wrongful act constitutes a contempt of the trial court because of the imposition and fraud upon that court, yet it is also a contempt of this court, and punishable as such, because the wrongdoer has affronted this court by usurping a privilege solely within the power of this court to grant. (*People* v. *Czarnecki,* No. 8901, *supra.*) In a recent case (*In re Morse, supra,*) the Supreme Court of Vermont held that since it had exclusive power with respect to the admission and licensing of attorneys to practice in that State it necessarily had the power in an original proceeding to punish an unlicensed person who had acted as an attorney in the justice of the peace courts of that State.

It is also argued that for acts outside of court which amount to unauthorized practice of law the offender cannot be punished for contempt of this or any other court. What we have said above should be sufficient to dispose of this contention. To deny the power of the court to deal with such offenders would be tantamount to a destruction of the power itself. Perhaps the major portion of the actual practice of law under modern conditions consists of the work of attorneys outside of any court and has nothing to do with court proceedings. (*People* v. *Alfani, 227* N. Y. 334, 125 N. E. 671.) It is just as essential to the administration of justice and the proper protection of society that unlicensed individuals should not be permitted to prey upon the public in that sphere of the practice of law as it is with respect to proceedings in the courts. It is no less a usurpation of the function and privilege of an attorney and an affront to the court having sole power to license attorneys, for one not licensed as such to perform the services of an attorney outside of court proceedings.

As stated above, this court has inherent power and control over the general subject of the practice of law, and this includes the power to punish unauthorized persons for presuming to practice law without being licensed so to do by this court. Respondent is a corporation. It has not been and cannot be licensed or permitted by this court to practice law. (*In re Co-operative Law Co.* 198 N. Y. 479, 92 N. E. 15.) A corporation can neither practice law nor hire lawyers to carry on the business of practicing law for it. (*People* v. *California Protective Corp.* 76 Cal. App. 354, 244 Pac. 1089.) The right to practice law attaches to the individual and dies with him. It cannot be made the subject of business to be sheltered under the cloak of a corporation having marketable shares descendible under the laws of inheritance. (*State* v. *Merchants' Protective Corp.* 105 Wash. 12, 177 Pac. 694; *People* v. *Merchants' Protective Corp.* 189 Cal. 531, 209 Pac. 363.) In the case of *In re Otterness*, (recently decided,) the Supreme Court of Minnesota held that a corporation cannot itself practice law, nor can it lawfully do so by hiring an attorney to conduct a general law practice for others for pay, where the fees earned are to be, and are, received as income and profit by the corporation. (232 N. W. 318.) Likewise the Court of Appeals in Ohio has lately decided that, although not prohibited by criminal statute, it is unlawful for a corporation to practice law or maintain a legal department or hire attorneys and advertise their services for the use of others. *Dworken* v. *Apartment House Owners Ass'n*, 38 Ohio App. 265.

Respondent, being a corporation, is also prohibited by statute from practicing law in Illinois. (Smith's Stat. 1929, chap. 32, pars. 411-415, pp. 787-788.) It was within the power of the legislature to make such a prohibition (*In re Day, supra,*) and also to provide a penalty for violations of it. But the statute referred to does not have the effect of excluding the power of this court to fix such

punishment as it may see fit for the contempt of this court involved in the usurpation by a corporation of the office of an attorney. The legislature has not attempted to tie the hands of the courts in dealing with contempts of this kind, and any attempt to do so would be an infringement upon the inherent exclusive jurisdiction of the courts. We are not required to pass upon the question whether an offender could be subjected not only to the penalties provided by the statute but also to such other punishment as this court might choose to impose in a given case, for no prosecution against respondent under the statute has been undertaken. Suffice it to say, that for any contempt of this court ample power here exists to inflict an appropriate punishment. So far, therefore, as the information seeks punitive relief it invokes a jurisdiction which is inherent in this court in cases of this kind.

The question remaining for consideration is whether the conduct of respondent has amounted to practicing law. As above indicated, the practice of law involves not only appearance in court in connection with litigation but also services rendered out of court. In litigated matters it involves not only the actual representation of the client in court but also services rendered in advising a client as to his cause of action or defense. The practice of law also includes the giving of advice or rendering services requiring the use of legal skill or knowledge. The commissioner in his report has submitted a definition for "practicing law," as follows: "Practicing as an attorney or counselor at law, according to the laws and customs of our courts, is the giving of advice or rendition of any sort of service by any person, firm or corporation when the giving of such advice or rendition of such service requires the use of any degree of legal knowledge or skill." In our opinion this definition is substantially correct. It is in substantial accord with the definition employed by a special committee of the American Bar Association in drafting supple-

ments to the canons of professional ethics. (52 Am. Bar Ass'n Rep. 1927, p. 382.) In *Matter of Duncan*, 83 S. C. 186, 65 S. E. 210, 24 L. R. A. (n. s.) 750, it is said: "It is too obvious for discussion that the practice of law is not limited to the conduct of cases in courts. According to the generally understood definition of the practice of law in this country, it embraces the preparation of pleadings and other papers incident to actions and special proceedings and the management of such actions and proceedings on behalf of clients before judges and courts, and, in addition, conveyancing, the preparation of legal instruments of all kinds, and, in general, all advice to clients and all action taken for them in matters connected with the law. An attorney at law is one who engages in any of these branches of the practice of law. The following is the concise definition given by the Supreme Court of the United States: 'Persons acting professionally in legal formalities, negotiations or proceedings by the warrant or authority of their clients may be regarded as attorneys at law within the meaning of that designation as employed in this country.' (*Savings Bank* v. *Ward*, 100 U. S. 195, 25 L. ed. 621.) Thornton on Attorneys at Law (sec. 69) defines the practice of law in the same terms, and the substance of this definition has been approved in a number of other jurisdictions.—*People* v. *Alfani, supra,* and authorities there cited." While we do not adopt finally the definition suggested by the commissioner, we think it will serve in general as a basis in a given case for determining whether one charged with unauthorized practice of law has been guilty of contempt of this court and whether and to what extent he should be punished.

Respondent in the present case has, beyond question, deliberately engaged in unauthorized practice of the law. The findings of fact in the report of the commissioner leave no room for doubt concerning the matter. That it used for that purpose the services of licensed attorneys in

its employ does not alter the fact that it was thus practicing law. Some of the findings of the commissioner are challenged, and we have given due weight to the exceptions of respondent. It is unnecessary to discuss those exceptions in detail. The findings of fact of the commissioner are, in the main, fully supported by the evidence. In a few instances the commissioner has drawn inferences from the facts which are challenged, but they do not materially affect his ultimate conclusions of fact, which we approve. The record shows, beyond doubt, that respondent has for several years conducted proceedings in the circuit, superior and probate courts of Cook county under cover of the names of licensed attorneys who were its salaried employees and appropriated to its own use the fees allowed to or charged by these attorneys. For several years it also examined abstracts of title and rendered legal opinions thereon, prepared and attended to the execution of wills for its customers and others and furnished the legal advice necessary to the performance of these services, all by the use of the names of the attorneys employed by it, and has appropriated to its own use the attorneys' fees charged and collected for all such services and advice. The foregoing is sufficient to show the nature and extent of respondent's offenses for which it is punishable.

It appears that respondent in 1927 ceased performing services of the kind above mentioned. Since 1927 it has performed other acts and rendered other services, as summarized in the commissioner's report, some of which do and some of which do not constitute the practice of law. Many of the documents prepared by the respondent and other services rendered by it involved the use of legal knowledge and skill. Where the rendering of such services involves the use of legal knowledge or skill, or where legal advice is required and is availed of or rendered in connection with such transactions, this is sufficient to characterize the services as practicing law. *People* v. *Schreiber*, 250 Ill.

345; *People* v. *Alfani, supra; People* v. *Title Guarantee and Trust Co.* 227 N. Y. 366, 125 N. E. 666; *In re Eastern Loan and Trust Co.* 288 Pac. (Ida.) 157.

Where a will, contract or other instrument is to be shaped from facts and conditions, the legal effect of which must be carefully determined by a mind trained in the existing laws in order to insure a specific result and guard against others, more than the knowledge of the layman is required, and a charge for such service brings it definitely within the term "practice of the law." *In re Eastern Loan and Trust Co. supra.*

We come, now, to the question of the punishment to be inflicted upon respondent. It appears from the record that respondent ceased certain wrongful practices in 1927. We are unable to agree with the respondent's contention that it should not be punished for its misconduct. A more aggravated case of deliberate, unauthorized practice of law by a corporation could rarely be found. Until November, 1926, it was engaged, through the attorneys in its employ, in performing nearly every kind of legal services that an attorney in general practice might be called upon to perform, and charged, collected and appropriated to its own use the attorneys' fees for these services. When in November, 1926, its misconduct was called to the attention of its officers, instead of discontinuing its wrongful practices it caused to be organized a purported law firm of young attorneys employed by it to conduct its law practice. It was not until April, 1927, that this subterfuge was abandoned. Upon the trial of this case before the commissioner it showed an utter lack of that candor which is to be expected of one who seeks to avoid punishment for its offenses. In several instances, by objections of various kinds to the introduction of evidence and the competency of the witnesses, it sought to prevent a full disclosure of the facts which were especially within its control. While vigorously insisting that the showing made by relators was inadequate

in some particulars, with all the facts undoubtedly in its possession it failed to produce them. Although production of its books and records relating to its conduct and the amount of its attorneys' fees was demanded, only a portion of one account was produced. It is true that it offered to permit relators to enter its offices and search for information. Perhaps, if the showing made by relators had not been sufficient to establish the misconduct of respondent it would have been necessary for relators to have compelled the production of the books and records. But we are dealing now with a case where, after the misconduct has been established, the offender seeks to avoid punishment, and in such a case its candor or lack of candor in proceedings instituted in this court may properly be considered.

It is impossible to determine from this record the aggregate amount of respondent's income derived from its practice of law. This difficulty is caused principally by its failure to produce its books and records, over which it had exclusive control. On the basis of the evidence a conservative estimate of the fees so received would be not less than $50,000. It is likewise impossible to ascertain from the record the amount of its net income from this source. The commissioner finds that the respondent, through its attorneys, "admitted" that the profits of such business, after deducting the salaries of all employees engaged therein, overhead and other expenses, would be not less than $1000 per year. We are thus left to conjecture as to whether the net income was more than $1000 per year, and if so, by how much. The amount of the fees received by respondent does not furnish the only basis for determining the punishment which this court may see fit to impose in this or any other case. Even in a case where no money consideration is derived from such services, the court may fix a punishment suitable to the circumstances of the offense. In view of the fact that this is the first time this court has been called upon to decide the questions involved here-

in, we have determined that a fine of $1000 shall be imposed. We accordingly enter judgment herein requiring respondent to pay to the clerk of this court a fine in the sum of $1000 and costs for contempt of this court, as evidenced by the acts of the respondent.

*Respondent found guilty of contempt.*