RHODE ISLAND BAR ASSOCIATION *et al. vs.* AUTOMOBILE SERVICE ASSOCIATION *et al.*

MAY 9, 1935.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker, and Condon, JJ.

CONDON, J. This is a petition brought by Judah C. Semonoff, James A. Higgins, and Eugene L. Jalbert, members of the bar of this State and duly qualified members of the Committee on The Illegal Practice of the Law of the Rhode Island Bar Association, on their own behalf and on behalf of said bar association, a voluntary association, against Francis J. Loughlin, John F. Phillips, and James Conaty, doing business under the name and style of Automobile Service Association, otherwise known as "A. S. A.," and Edward W. Morris, Esq., a member of the bar of this State, to adjudge said respondents in contempt of the authority of this court for illegal practice of the law.

It appears from the allegations in the petition and the testimony given before us that the respondents have performed and hold themselves out to perform the following services:

"MANSLAUGHTER.

"(1) The Association will furnish Counsel free of charge to represent and defend in a lawful manner the said Member against Criminal Prosecutions for criminal negligence, or Manslaughter, which may be alleged while in the operation of a motor vehicle covered herein, in accordance with law in the said operation; or his agent, servant, employee or member of his family, while operating the motor vehicle covered by the Member and covered by this covenant.

STATE LAWS, CITY ORDINANCES.

"(2) The Association will furnish Counsel free of charge to represent and defend the said Member, members of his family, his agents and servants as aforesaid, in all other Criminal Proceedings arising out of the operation or use of a motor vehicle which is covered herein, in the event of being charged with the violation of a State Law, or City

or Town Ordinance concerning the operation of motor vehicles on the public highway or the regulation of traffic or the rules of the road.

### Damage Suits Against Others.

"(4)   The Association will furnish Counsel to bring suit free of charge to collect the damages caused to the machine covered by this contract by another machine, trolley car or other vehicle if no settlement or adjustment can be effected, and if in the opinion of Counsel for the Association the member has a meritorious claim.

### Defense.

"(5)   The Association will furnish Counsel free of charge to represent and defend the said Member against all Civil Suits arising from a collision of the car covered by this covenant with that of another person which result in claims or actions for personal injury or property damage.

### Legal Advice.

"(7)   The Association's attorneys will furnish consultation and legal advice free of charge to the Member or members of his family on any legal matter pertaining to the use, operation, ownership and transfer of an automobile.

### Hearings.

"(8)   The Association will furnish free of charge consultation and legal advice to the Member, members of his family, his agent, servant or employee, in all matters relating to his or her driver's license or registration, and will furnish Counsel to represent and defend such person at all hearings held by the State Official relating to the suspension or reinstatement of driving licenses or registra-

tions which may have been affected through the operation of the motor vehicle covered herein."

The lay respondents admit they have performed such services but deny that the manner in which they have been performed through their attorney, respondent Morris, constitutes the practice of law by them, and pray that this court define by its decree what is the practice of law.

The practice of law is difficult to define. Perhaps it does not admit of exact definition. Whether or not it can be reduced to definition is not important to the decision of the matter before us at this time. "Definition, simple, positive, hard and fast as it is, never tells the whole truth about a conception," said the American philosopher, Josiah Royce, and we adopt that view in refraining from any attempt at definition here. That the practice of the law is a special field reserved to lawyers duly licensed by the court, no one denies. The lay respondents admit this but claim that the acts performed by them lie without the boundaries of that field. They support this contention by citing section 44 of chapter 401, "Of Offenses Against Public Policy," G. L. 1923, which reads as follows:

"Sec. 44. Whoever, not having been admitted to practice as an attorney at law or counsellor at law in any state of the United States, holds himself out, or who represents or advertises himself as an attorney or counsellor at law, by means of signs, business cards, letter heads, printing, words, acts, or any other representations, or, not having been admitted to practice as an attorney at law or counsellor at law in accordance with the statutes and in accordance with the provisions and regulations of the supreme court of this state, holds himself out or represents himself to be lawfully qualified to practice law in the courts of this state, by means of signs, business cards, letter heads, printing, words, acts, or any other representations,

shall upon a first conviction be punished by a fine of not exceeding one hundred dollars or by imprisonment for not exceeding six months, or both, and, upon any subsequent conviction, by a fine of not exceeding five hundred dollars or by imprisonment for not exceeding one year, or both."

They say they have not violated this statute but if they have, then there is a remedy for their offense in the criminal court and, therefore, there is no need for this contempt proceeding. They assume that the act of the general assembly defines for all purposes the practice of the law and takes the matter out of the control and supervision of this court. That is not so. The section cited does not comprehend all the many and varied acts which may be done within the practice of the law, nor do sections 45, 46, and 47 of the same chapter which set out other acts constituting, in the opinion of the legislature, illegal and unauthorized practice of the law, and make them punishable by fine or imprisonment. They merely enumerate some of them and prescribe a penalty for the performance of any of them by unauthorized persons. If, however, they did include all possible acts, it would not impair or restrict the power of this court over the practice of the law. Indeed all of these sections, since the bringing of these proceedings, have been extensively and somewhat comprehensively amended and amplified by the general assembly at its January Session by chapter 2190 of the Public Laws 1935. Yet the power of the court to regulate and control the practice of the law remains where it has always been, notwithstanding the exercise by the general assembly of its undoubted power to declare acts of unauthorized practice of the law illegal and punishable by fine or imprisonment, or both. We hold that the enactment of chapter 401, section 44, and also sections 45, 46, and 47, was in aid of the authority of this court in the regulation and control of the practice of the law, and not subversive of it.

It may be pointed out here that the same act of a person may constitute a violation of the criminal law and also may constitute such a violation of his equitable duties towards others as to justify the use of the equity powers of the court, notwithstanding the punishability of his conduct as a crime. It has been urged that this would be using the equity powers of the court to punish crime, but this objection has been held untenable. The rule is now well established that the two jurisdictions are separate and distinct but may apply to the same conduct. In like manner, unauthorized practice of the law may constitute a violation of the criminal law and be punishable as such, and yet may constitute at the same time a contempt of the authority of the court which may be forbidden by injunction. "Ordinarily, injunction does not lie merely to prevent commission of crime. But the criminality of an act or series of them does not bar injunctive relief if otherwise there is ground for it. 32 C. J. 277." *Fitchette* v. *Taylor*, —— Minn. ——, 254 N. W. 910, 94 A. L. R. 356, and note at page 363. We think the same reasoning is applicable in this contempt proceeding in which petitioners were granted a restraining order during the pendency of the petition.

It is not necessary, in order to sustain the power of the court, to hold that the legislature cannot also act to prevent the evils to the public that inevitably arise from unauthorized practice of the law. In the exercise of the police power it undoubtedly can legislate in this matter. The statute, therefore, cannot avail these respondents if their admitted acts are within the field of practice of the law. Stripped of all extraneous issues, that is the real question before us in this proceeding. If the acts complained of by the petitioners, and admitted by the respondents, are found to amount to the practice of law, then summary action will be in order as prayed for by the petitioners.

While a proceeding to adjudge in contempt for unauthorized practice of the law does not appear to have been brought

heretofore in this State, we are nevertheless satisfied that it is a proper proceeding. It has been employed in other jurisdictions, under similar circumstances, and approved. *People ex rel.* v. *People's Stock Yards State Bank*, 344 Ill. 462, 176 N. E. 902; *People ex rel.* v. *Motorists' Assoc.*, 354 Ill. 595, 188 N. E. 827; *In re Morse*, 98 Vt. 85, 126 Atl. 550. Nevertheless, we do not encourage it. In trivial or unimportant instances of illegal practice of the law, it should not be used. Where other remedies are available and efficient to right the wrong complained of, they should first be invoked, unless there is, as in the instant case, an evident need for summary action to protect the public and the jurisdiction of the court. This inherent power of the judiciary to punish for contempt is a necessary but also a dangerous power, and is therefore to be used with great caution. In this instance, the peculiar circumstances seem to call it forth to vindicate the jurisdiction and authority of this court over a matter that is intimately related to the administration of justice and that deeply affects the public welfare. For these reasons it seems to us that this proceeding is a warranted exercise of the power. If these respondents are engaged in the practice of law, a great wrong is being done to the public and the ancient and exclusive rights and privileges of the bar are being invaded in contempt of the authority of this court, which alone has the power to license attorneys and counsellors at law in the courts of this State, and to admit them to practice law.

How this power is derived does not concern us here, and it is therefore unnecessary to inquire into it. In Rhode Island, at least since the adoption of the State constitution, it has been vested in this court. The general assembly has conceded this by section 2, chapter 322, G. L. 1923, wherein it is declared that "the supreme court . . . shall by general or special rules regulate the admission of attorneys to practice in all the courts of the state." This language has long been accepted by common consent to be declaratory of the power inherent in this court to control and supervise

the practice of law generally whether in or out of court. A careful examination of the public laws, even before the adoption of the constitution, and as far back as the year 1800, fails to reveal any enactment of the general assembly assuming to regulate the matter by statute. On the other hand, there is ample evidence of the exercise of this power as a matter of course by the Superior Court of Judicature established in 1746-47 which was the predecessor of this court until 1798, when it became the Supreme Judicial Court.

The practice of the law in England had for centuries been carefully guarded in the public interest by the justices. As the English colonists developed a settled form of government here under their several royal grants or charters, they adopted the judicial machinery with which they were familiar in the homeland. Weeks on Attorneys at Law, (2nd ed.) § 25, page 35, says: "When England sent out her colonies, the bar, like most other institutions, reappeared upon the new soil, and held a similar position to the one it held at home; it existed because the conditions of a progressive society required its existence." While the division of the bar into attorneys and barristers never took root here, it was generally accepted that no one should commonly practice as an attorney without first qualifying as such. *Ricker's Petition*, 66 N. H. at page 225. One who desired to so qualify presented himself at court. The court was commonly regarded as the sole authority over the control and supervision of the bar, although in New York it would seem that in Colonial days admission to practice was by appointment by the governor. *Matter of Cooper*, 22 N. Y. at page 90. From the very beginning of the federal government, however, the custom of the other states was followed. "In this country, the courts of the United States have always controlled the admission of attorneys." *In re Day*, 181, Ill. 73, 54 N. E. 646 at page 650.

Authority to admit to the bar and to disbar necessarily carries with it power to define what constitutes the practice

of the law, and to exclude unauthorized persons therefrom. The reason for this has been well stated in *People ex rel* v. *People's Stock Yards State Bank, supra*, in the following words: "Having power to determine who shall and who shall not practice law in this State, and to license those who may act as attorneys and forbid others who do not measure up to the standards or come within the provisions of its rules, it necessarily follows that this court has the power to enforce its rules and decisions against offenders even though they have never been licensed by this court. Of what avail is the power to license in the absence of power to prevent one not licensed from practicing as an attorney? In the absence of power to control or punish unauthorized persons who presume to practice as attorneys and officers of this court, the power to control admissions to the bar would be nugatory."

The practice of the law is affected with a public interest. It is, therefore, the right and duty of the State to regulate and control it so that the public welfare will be served and promoted. Assuring protection to duly licensed attorneys and counsellors against invasions of their franchise by unauthorized persons is only incidental or secondary to this primary purpose. Great and irreparable injury can come to the people, and the proper administration of justice can be prevented, by the unwarranted intrusion of unauthorized and unskilled persons into the practice of the law.

Courts have repeatedly held that the members of the legal profession are officers of the court and important aids in the administration of justice. The United States Supreme Court has even said that attorneys "constitute a profession essential to society." *Randall* v. *Brigham*, 7 Wall. 523. And in *Bryant's Case*, 24 N. H. 149, at page 158, it was said: "Any thing that tends to lower the standard of professional acquirements among those whose duty it is to investigate and defend the rights of others, is to be lamented. Every man may be a plaintiff or defendant. Every man may have a right to enforce, or an unjust claim

to resist. . . . When he applies to an attorney for advice he should have security, from the attorney's previous study of his profession, that he is reasonably competent to discharge his trust." The court went on to add that the maintenance of these high standards was more important to the public than to the attorneys, and with this view we are in agreement.

This court, by the Constitution, Art. X, sec. 1 and Art. XII, sec. 1 of Amendments, has had imposed upon it the duty of protecting the public in the administration of justice. If it could not inquire into the legality of the subterfuges, schemes and devices by means of which unauthorized persons may contrive to circumvent the barriers to their practice of the law, it would be thereby rendered impotent to discharge a great and important part of that duty. As was said in *Fitchette* v. *Taylor, supra:* "Having the power through disciplinary proceedings to protect the public by preventing attorneys from indulging in the unlawful practice of law, . . . it would be anomalous if we had no similar power to protect the public from the illegal practice of law by laymen." The bar would suffer in such a case, but the people would suffer even more.

This was early recognized in England. For a long period after the Conquest and the setting up of the Norman kings' courts, there was no organized class of attorneys skilled in the law and entitled to practice. Representation by attorney was unknown to the common law and it was only by special royal permission in exceptional cases that it was granted. Finally, however, these royal licenses became more and more frequent until certain men began to appear regularly as attorneys for a variety of litigants, and their number grew apparently without much, if any, regulation or control. The result was an abuse that required and received the attention of the crown. In the year 1292, Edward I by royal ordinance limited the number of attorneys and directed his justices to provide a sufficient number for each county. This order is a landmark in the history of

the development of English law, and Pollock and Maitland, Vol. 1, 194, History of English Law, say of it: "We may infer that already before 1292 these practitioners had acquired an exclusive right to be heard on behalf of others. In that year, king Edward directed his justices to provide for every county a sufficient number of attornies and apprentices from among the best, the most lawful and the most teachable, *so that king and people might be well served.* The suggestion was made that a hundred and forty of such men would be enough, *but the justices might, if they pleased, appoint a larger number.*" (Italics ours.) From this, it is quite clear that a condition, intolerable to the king's people, had grown up by the promiscuous practice around the king's courts of persons unskilled in the law and untrustworthy. It is equally clear that the object of this first attempt at regulating the bar was the well-being of government and people, and that the duty of bringing that about was expressly charged upon the justices.

There was still, however, no strict regulation, so that in the course of another century the number assuming to act as attorneys had grown to two thousand. Large numbers of these were unskilled and uneducated and had presumed to act as attorneys without warrant. The evil finally became so great that in the year 1402 Parliament this time took cognizance of it and enacted the now famous statute, 4 Henry IV, Ch. 18, which provided that all attorneys should be examined by the justices, and in their discretion, only those found to be good and virtuous, and of good fame, learned and sworn to do their duty, be allowed to be put upon the roll and all others put out. As sergeants were regulated already by their inns of court under supervision of the judges, they were not included in this statute. This statute is said by some to mark the beginning of the division of the English bar into barristers and attorneys. It is of interest to us here, however, only to illustrate that the bar arose out of a public demand for the exclusion of those who assumed to practice law without adequate qualifications

therefor. It is also of importance because it shows beyond question that the duty of excluding unauthorized persons was left to the discretion of the justices.

This conception of the practice of the law and its control by the court was the one which the English colonists brought with them to this country. Originally, no one questioned the authority of the court over this matter, or sought to limit it merely to the admission of attorneys to practice in court. Admission to the bar meant admission to practice law, and admission to practice law comprehended all the activities of a lawyer in advising and assisting others in all matters of law both in and out of court. The Supreme Judicial Court of Massachusetts has very recently—(1935), *Opinion of The Justices to The Senate*. Mass. 343, at page 349 —expressed itself most fully on this point as follows: "Practice of law under modern conditions consists in no small part of work performed outside of any court and having no immediate relation to proceedings in court. It embraces conveyancing, the giving of legal advice on a large variety of subjects, and the preparation and execution of legal instruments covering an extensive field of business and trust relations and other affairs. Although these transactions may have no direct connection with court proceedings, they are always subject to become involved in litigation. They require in many aspects a high degree of legal skill, a wide experience with men and affairs, and great capacity for adaptation to difficult and complex situations. These customary functions of an attorney or counsellor at law . . . bear an intimate relation to the administration of justice by the courts. No valid distinction, so far as concerns the questions set forth in the order, can be drawn between that part of the work of the lawyer which involves appearance in court and that part which involves advice and drafting of instruments in his office. The work of the office lawyer is the groundwork for future possible contests in courts. It has profound effect on the whole scheme of the administration of justice. It is performed

with that possibility in mind, and otherwise would hardly be needed. . . . It is of importance to the welfare of the public that these manifold customary functions be performed by persons possessed of adequate learning and skill, of sound moral character, and acting at all times under the heavy trust obligation to clients which rests upon all attorneys. The underlying reasons which prevent corporations, associations and individuals other than members of the bar from appearing before the courts apply with equal force to the performance of these customary functions of attorneys and counsellors at law outside of courts. Decisions of the courts, some of which deal with statutes, are unanimous on these points, so far as we are aware."

We see no reason to limit or narrow the scope of this language in applying it to the question of what constitutes the practice of the law in Rhode Island. This broad view of what is practice of the law is held by the United States Supreme Court and generally by the state courts. *In Re Duncan*, 83 S. C. on page 189, 65 S. E. 210, the court says: "It is too obvious for discussion that the practice of law is not limited to the conduct of cases in courts. According to the generally understood definition of the practice of law in this country, it embraces the preparation of pleadings and other papers incident to actions and special proceedings and the management of such actions and proceedings on behalf of clients before judges and courts, and in addition conveyancing, the preparation of legal instruments of all kinds, and in general all advice to clients and all action taken for them in matters connected with the law. An attorney at law is one who engages in any of these branches of the practice of law. The following is the concise definition given by the Supreme Court of the United States: 'Persons acting professionally in legal formalities, negotiations or proceedings by the warrant or authority of their clients may be regarded as attorneys at law within the meaning of that designation as employed in this country.' " And so in *Fitchette* v. *Taylor*, *supra*, also it was said: "The conduct

of litigation is by no means all of legal practice. A lawsuit is but one process of settling an issue of legal right and wrong. Many are disposed of without suit. But the disposition of such issues for others, by advice and negotiation, for hire, is as much the practice of law as though process and pleadings, with or without trial, were necessary. Counsel as to legal status and rights, and conduct in respect thereto, are as much a special function of the English solicitor and the American lawyer as diagnosis, prognosis, and prescription are in the field of medicine."

Now these lay respondents have admitted the doing of the acts alleged in the petition. They say these acts do not amount to the practice of the law. Under the broad view of the term adopted by the courts cited, with which we are in accord, we believe these acts, particularly when taken together and viewed as a whole, clearly amount to the practice of law. Each of the several numbered paragraphs of the respondent's (A. S. A.) contract with its customers, calls for legal service of some kind, except paragraphs three, six and eleven. True, this legal service is to be rendered not by them personally but by counsel designated by them. Ostensibly such service is free, but actually it is by far the major part of the consideration which the customer receives for his membership fee. Out of eleven paragraphs, only three are not of a legal nature and two of those are so inconsequential as to be disregarded.

These respondents then are engaged in selling legal advice and assistance in association with a duly licensed member of the bar of this court. Their association with this member does not absolve them from responsibility. We see no difference in their case from that of the respondent in *In re Co-operative Law Co.*, 198 N. Y. 479, 92 N. E. 15, (1910), where the court says: "The relation of attorney and client is that of master and servant in a limited and dignified sense, and it involves the highest trust and confidence. It cannot be delegated without consent, and it cannot exist between an attorney employed by a corporation to

practice law for it, and a client of the corporation, for he would be subject to the directions of the corporation, and not to the directions of the client. There would be neither contract nor privity between him and the client, and he would not owe even the duty of counsel to the actual litigant. The corporation would control the litigation, the money earned would belong to the corporation, and the attorney would be responsible to the corporation only. His master would not be the client but the corporation, conducted it may be wholly by laymen, organized simply to make money and not to aid in the administration of justice which is the highest function of an attorney and counselor of law. The corporation might not have a lawyer among its stockholders, directors, or officers. Its members might be without character, learning or standing. There would be no remedy by attachment or disbarment to protect the public from imposition or fraud, no stimulus to good conduct from the traditions of an ancient ·and honorable profession, and no guide except the sordid purpose to earn money for stockholders. The bar, which is an institution of the highest usefulness and standing, would be degraded if even its humblest member became subject to the orders of · a money-making corporation engaged not in conducting litigation for itself, but in the business of conducting litigation for others. The degradation of the bar is an injury to the state."

The fact that the respondent there was a corporation and that these respondents are a voluntary association operating under a trade name is not important. We think the facts are almost identical with the case before us. If anything more were needed to convince us that the arrangement under which the respondents have been operating involved the practice of law, it could be supplied by applying the test whether they could perform the services promised under their contract without the assistance of a duly licensed attorney. At least as to eight of the eleven obligations, they could not perform their promises in the slightest

degree without the cooperation of a duly licensed member of the bar. Thus, indirectly through the respondent Morris, they have been assuming to conduct a law practice on a wholesale business scale reaching throughout the state. What these respondents cannot legally do directly they may not do indirectly. They say they have conducted this business for twelve years without interference. This may well be, but mere length of time does not and cannot convert into a legal act what is illegal. The only way to acquire the right to practice law in this state is through the procedure prescribed by the rules of this court. Anyone who attempts to perform legal services for others, without first having been duly admitted to practice by this court, does so at his peril.

We find, therefore, that these lay respondents under the disguise of a so-called service contract to their customers have been practicing law in association with respondent Morris. Their contempt of the authority of this court in the premises is not at all palliated by their retaining Morris to assist them. Rather it weighs more strongly against them in that they must have fully appreciated they were holding themselves out to the public to render services they were incapable of performing in conformity with the law. It is, indeed, regrettable that they were able to find a duly accredited member of the bar of this court who was willing to associate with them, as without him, or some brother attorney, their enterprise could not function.

When this arrangement between these lay respondents and the respondent Morris began to function, not only were they engaged in the unauthorized practice of law, but Morris, notwithstanding his license from this court, was practicing law in an illegal manner. It seems to us this conclusion is inescapable. The conduct of the respondent Morris was inconsistent with the ethics of his profession, though presumably he did not realize this. He seems to have given little thought to the nature of his association with these lay respondents, though he was really permitting

them to use his authority as an officer of this court to furnish the foundation of an enterprise that degraded his calling to the level of a common huckstering business. This was certainly not the standard of conduct to be expected of a member of the bar of this court. Rather it was the contrary. As an agent and an aid of the court in the administration of justice, the true lawyer, conscious of the dignity of his calling, will instinctively avoid such associations, notwithstanding that it may mean the foregoing of a more or less lucrative source of business. Chief Justice CARDOZO, in *People* v. *Culkin*, 248 N. Y. 465, 162 N. E. 487, had this idea in mind when he expressed himself in the following words: " 'Membership in the bar is a privilege burdened with conditions.' *Matter of Rouss, supra,* 221 N. Y. 81, 116 N. E. 782. The appellant was received into that ancient fellowship for something more than private gain. He became an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice. His cooperation with the court was due, whenever justice would be imperiled if cooperation was withheld. He might be assigned as counsel for the needy, in causes criminal or civil, serving without pay." These are not idle words, nor mere rhetoric.

The bar is an important element of our judicial system and all of its members are obligated to govern their professional conduct in full accord with the solemn responsibility which that entails. Under our system of law the most effective guaranty of equal justice to all in the commonwealth is a competent and learned bar composed of men of high personal character who govern their professional conduct at all times by the well known and generally accepted canons of legal ethics. The lack of such a bar, or the co-existence with it of an array of individuals or groups operating under deceptive devices and catch-names to mislead the public into the belief that they are entrusting their causes to those learned in the law and competent to serve them, would inevitably result in a deprivation of

justice to many in the State. In such an atmosphere, there would be a strong tendency for the bar to sink to the level of its unauthorized and unqualified competitors.

It is our duty to prevent this unfortunate and evil event whenever it threatens. This court is the agent of the people in the administration of justice in this State and has been vested with ample powers to vindicate its authority in this department of the people's government. It would be recreant to the great trust reposed in it if it did not guard every agency by which justice is administered. To safeguard the practice of the law, which touches so intimately the administration of justice, and to promote the welfare of the people, whose ministers we are, this court has ordained certain standards of character and education as a prerequisite to admission to the bar. These standards are high, as indeed they ought to be, and there is constant pressure to elevate them still higher, all to the end that the people may be assured the best possible service in the dispatch of their legal business. None must be permitted to evade these requirements by doing indirectly what they cannot do directly.

We must, therefore, hold all these respondents in contempt as charged. They are hereby ordered to present themselves before this court on June 3, 1935, at 9 o'clock, a. m., Eastern Standard time, to hear what the court shall further order in the premises, at which time the petitioners may prepare a decree conformably to our opinion.

*Clarence N. Woolley, Judah C. Semonoff, Patrick H. Quinn, Paul R. McIntyre, Henry B. Gardner, Jr.*, for petitioners.

*Edward W. Morris*, for respondents.