**KENTUCKY STATE BAR ASSOCIATION,**
Complainant,

v.

**FIRST FEDERAL SAVINGS & LOAN AS-
SOCIATION OF COVINGTON, Ken-
tucky, a corporation, Respondent.**

Court of Appeals of Kentucky.

Dec. 9, 1960.

As Modified on Denial of Rehearing

Feb. 17, 1961.

Carl H. Ebert, Lorimer W. Scott, New-
port, for complainant.

Orie S. Ware, William O. Ware, James
C. Ware, Ware & Ware, Covington, for re-
spondent.

CLAY, Commissioner.

This is an original contempt proceeding
brought in this Court by The Kentucky
State Bar Association against the respond-
ent, First Federal Savings and Loan As-
sociation of Covington, Kentucky, charging
respondent with engaging in the unauthor-
ized practice of law. We have heretofore
overruled respondent's motion to dismiss the
show cause rule, which motion challenged
this Court's jurisdiction to proceed against
it, a non-member of the legal profession.
As justification for this ruling see Hargett
v. Lake, Ky., 305 S.W.2d 523; Carter v.
Trevathan, Ky., 309 S.W.2d 746; Carter
v. Brien, Ky., 309 S.W.2d 748; In re
Sparks, 267 Ky. 93, 101 S.W.2d 194; Peo-
ple ex rel. Illinois State Bar Ass'n v. Peo-
ple's Stock Yards State Bank, 344 Ill.
462, 176 N.E. 901; In re Baker et al., 8
N.J. 321, 85 A.2d 505; Richmond Associa-
tion of Credit Men v. Bar Association, 167

Va. 327, 189 S.E. 153. The question now before us is whether or not the respondent has engaged in the practice of law in violation of KRS 30.010. That statute forbids such professional activity by a person without a license.

The practice of law is thus defined in RCA 3.020:

"'The practice of law' is any service rendered involving legal knowledge or legal advice, whether of representation, counsel, advocacy in or out of court, rendered in respect to the rights, duties, obligations, liabilities, or business relations of one requiring the services. But nothing herein shall prevent any person not holding himself out as a practicing attorney from drawing any instrument to which he is a party without consideration unto himself therefor."

Respondent is a building and loan association and its principal business consists of making loans secured by mortgages on real estate. Before making any such loan respondent requires that a title examination be made on the property to be mortgaged, and of course loans are not made unless, in the opinion of an attorney, the title is clear.

■ It is not questioned that a "title examination" (which includes an analysis of recorded interests in land coupled with an opinion as to its legal status) is a service which lawfully can be performed for others only by a licensed attorney. Customarily in this business such service may be rendered by a lawyer representing the borrower (whose certification will be accepted by the lender), or it may be performed by a lawyer of the lender's selection (who is paid an attorney's fee for each such service rendered).

Respondent does not follow either of these courses which involve the normal attorney-client relationship. Instead it engages its own lawyer as a regular employee, paying him a fixed salary of $10,000 a year.

This attorney performs various other legal services for respondent, but his principal work consists of examining and passing judgment on the validity of titles to property which will be mortgaged to the respondent as security for its loans. This is the practice of law.

During the years in controversy (1954–1958) respondent had title examinations made by its attorney in connection with all real estate loans financed by it. Since this attorney was on a straight salary, he did not receive a legal fee for each of these examinations, nor was a specific attorney fee therefor charged the borrower. It is respondent's contention that since this legal service was being performed on its behalf and no direct charge was made for the service to the borrower, it could not be engaged in the practice of law.

■ A corporation may properly employ its own attorney to render legal services for it. The position of the Bar Association is that the title examination service is not being rendered for respondent but for the borrower, and in addition (or in confirmation of that fact), the borrower is required to pay for it. If respondent, a corporation, is actually rendering a legal service to members of the public, and particularly if it is making a charge for such service, it is engaged in the unauthorized practice of the law.

It is apparent that the title examination is not made exclusively for the benefit of respondent. A clear title is one of the conditions upon which it will make a loan. The examination is made primarily for the benefit of the borrower so that he can comply with this essential condition. The fact that a charge is made to the borrower for this service, if such a charge is made, simply confirms the fact that the legal service is being rendered for him.

It is shown by the evidence that in making loans respondent collects from the borrower a "service charge" which ostensibly is made up of the *actual costs* of making a loan. On a "loan settlement statement"

furnished the borrower, which respondent at one time used, these "service charges" were itemized as "credit report," "survey," "appraisal," "*exam. of title*" and "recording fees." (Our emphasis.) In filling out this statement respondent did not normally list the separate charges but simply wrote in the total amount of the service charge which was fixed in accordance with its graduated scale (based upon the amount of the loan). However, on the veterans' loan forms submitted to the Veterans Administration, a specific charge was sometimes itemized for "title examination." In respondent's annual report to the Federal Home Loan Bank a substantial item of "net operating income" is listed as, "appraisal fees, *legal fees* and initial service charges." (Our emphasis.)

In spite of the vehement denials of respondent's counsel, it is clear from this record that the "service charge" made by respondent to the borrower included a variable amount which in fact (even if not in form) is a fee for the legal service of title examination. This is evident when we observe that the other items making up the "service charge" (excepting the "survey," which apparently is rarely made) are substantially the same regardless of the amount of the loan and the increased "cost" for a larger loan can only be attributable to the increased charge for the title examination. Likewise, respondent could not make a profit on these service charges (which it does) except upon this variable item which is not an actual fixed cost, (i. e., a specific expenditure of respondent for which it is entitled to reimbursement).

The officers who testified for respondent could not deny that the service charge included an unspecified amount as compensation for the title examination service. A typical answer of one of its officers (Mr. Wilbers, Vice President and Secretary) was as follows:

"Q. But part of your expense is examination of title, is it not, Mr. Wilbers?

"A. Well, that's the Association's expense of it. The attorney examines the title for the Association. If there is any excess, it goes into that account.

"Q. What do you collect for an attorney's fee?

"A. Nothing for attorney fees in general. We collect a service charge."

This same witness admitted that part of the loan expense projected in the service charge was allocable to the title examination.

It is clear from this record that (1) respondent renders to the borrower a title examination service, which is a legal service, and (2) respondent makes a charge for this service. (The Bar Association points out that respondent makes a substantial profit on this charge and contends it is usurious, but we deem it unnecessary to consider these additional factors in determining whether or not respondent is engaging in the practice of law.) The inescapable fact is that respondent renders to the borrower and charges the borrower a fee for the legal service of title examination. The professional relationship between the borrower and respondent's attorney is entirely absent.

A corporation, even though employing one or more lawyers, may not itself engage in the practice of law. Kendall v. Beiling, 295 Ky. 782, 175 S.W.2d 489. In essence the present case involves substantially the same character of service considered in Hobson v. Kentucky Trust Co., 303 Ky. 493, 197 S.W.2d 454. In that case we held that it constituted an unauthorized practice of law for a trust company, in acting as a fiduciary, to furnish as part of its trust services those services which were legal in nature, even though the legal advice upon which the company acted was given by an attorney in its employment. The furnishing of the title examination service in the present case falls within the same category. See In re Kenkel, Ky., 279 S.W.2d 770; People ex rel.

Illinois State Bar Association v. People's Stock Yards State Bank, 344 Ill. 462, 176 N.E. 901; Stewart Abstract Co. v. Judicial Commission, Tex.Civ.App., 131 S.W.2d 686.

■ The fact that respondent combines a legal service to the public with commercial services, which it properly may render, does not constitute an excuse for the unauthorized practice of the law. In re L.R., 7 N.J. 390, 81 A.2d 725. Even when a company is engaged in the *title insurance* business, it cannot sell to the public, though a relatively insignificant part of the transaction, the legal services of its own salaried attorney. Pioneer Title Ins. & Trust Co. v. State Bar of Nevada, 74 Nev. 186, 326 P.2d 408. For further cases on the unauthorized practice of law by corporations, see 157 A.L.R. 282.

■ We find on this record that respondent violates KRS 30.010 in both furnishing to the public and charging for the legal service of examining and approving titles to real estate, and we find respondent in contempt of this Court by such practice. The Bar Association insists that we should impose a heavy penalty since it is apparent respondent has for several years substantially profited by this condemned practice.

In view of the fact that this particular phase of commercial activity has not heretofore been considered, and since the violation is not of a flagrant nature (such as appeared in People ex rel. Illinois State Bar Association v. People's Stock Yards State Bank, 344 Ill. 462, 176 N.E. 901), we are not at this time inclined to impose a penalty. This will establish no precedent, and in view of our decision in this case and the decision in the Hobson case (Hobson v. Kentucky Trust Co., 303 Ky. 493, 197 S.W.2d 454), respondent and other corporations are now placed on notice that like or similar commercial activities which involve the unauthorized practice of law, however indirect and however intermingled with other services, are unlawful, condemned and shall not be engaged in. Future violations of this nature will be cause for the imposition of substantial penalties to terminate these practices.

Wherefore, respondent is adjudged in contempt, is ordered forthwith to cease and desist from the practice herein condemned, and shall pay all the costs of this proceeding.

BIRD, C. J., dissenting.

WILLIAMS, J., not sitting.