IN THE MATTER OF WALTER J. BAKER AND CHARLES E. BIEBER, CHARGED WITH CONTEMPT OF COURT.

Argued November 26, 1951—Decided December 21, 1951.

322

324

[redacted]

*Mr. Milton T. Lasher,* appointed by the court to prosecute the matter, argued the cause for the Committee on the Unauthorized Practice of the Law of the Bergen County Bar Association.

*Mr. John A. Christie* argued the cause for the respondent, Walter J. Baker.

*Mr. Bernard S. White* argued the cause for the respondent, Charles E. Bieber.

The opinion of the court was delivered by

VANDERBILT, C. J. This matter came before the court on a presentment by the Committee on the Unauthorized Practice of the Law of the Bergen County Bar Association. The presentment is based on facts submitted to the committee by Surrogate Donald G. Dutcher of Bergen County and Chauncey A. Phyley of the Bergen County bar with reference to the conduct of Deputy Surrogate Walter J. Baker of Bergen County and Charles E. Bieber, a title searcher working in the Bergen County Court House, in the preparation and execution of a will and a power of attorney for Walter Scott Knoph, a farmer of about 80 years of age residing in that county. The presentment states that the will after providing for specific bequests totalling $625 made Baker and Bieber residuary legatees and executors with a power of sale of real estate; that the power of attorney gave Baker and Bieber full control over all of Knoph's property

in the event of his becoming mentally incompetent; that Knoph had not read the will before signing it and giving it to Baker and Bieber to lodge with the Surrogate of Bergen County for safekeeping under a practice then in vogue there; and that instead of so lodging it Bieber kept it and surrendered it only after repeated requests. The presentment states that it was made to the court "for such further proceedings as it may deem necessary to determine whether or not the conduct of the said Walter J. Baker and Charles E. Bieber tends to bring the authority and administration of this Court into disrespect." We thereupon issued an order directed to Baker and Bieber requiring them to show cause why they should not be adjudged guilty of contempt of court and authorizing the taking of depositions to ascertain the facts.

## I.

The depositions reveal not the mere drafting and execution of a will and a power of attorney but a sordid story of infirm, friendless old age grossly imposed upon by a public official and his co-conspirator. The testimony of Bieber and Baker alone would be sufficient to convict them. Knoph is a fruit grower owning a small farm in Ramsey appraised at $9,000. He is uncertain of his exact age but he thinks he is 79. His wife died last year while in the State Hospital for the Insane at Morris Plains. According to Baker, "He was very bitter with his sister-in-law, because she threatened to send him to Morris Plains, claiming that he had sent her sister there, which was his wife." Knoph had heart spells quite often that lasted on an average of three-quarters of an hour. He had a special medicine which he carried with him and he had "one of the finest doctors in the country" from Suffern but he couldn't remember his name; "I know his telephone number." Baker himself testified that Knoph once said to him, "Oh, my gosh, I didn't know it was you. Since my wife died, my mind is going blank." The testimony and the correspondence between the parties showed that he was seek-

ing aid about the ordinary affairs of life, such as the purchase of a lawn mower and "bird scarers." He expressed an aversion to both bankers and lawyers and his penuriousness led him to seek free legal advice. He was an easy prey for any adventurer and yet not altogether incapable of rising to the occasion, a characteristic which precipitated the present proceeding. Baker had been Deputy Surrogate of Bergen County for seven years and before that he had been a member of the Bergen County Police Department for 18 years. Bieber had been a title examiner for nearly 40 years. Neither of them had been licensed to practice law.

Knoph first met Baker in February, 1951, when Knoph had a neighbor take him to the surrogate's office to get help with reference to some inheritance tax waivers on his wife's property so that he could get money out of the bank. From then on until September Baker says he saw Knoph "once a week for the whole time. I don't think I ever missed a time until I went on my vacation in September." These meetings were generally held at Knoph's home; "I went up there mostly to cheer him up and advise him; to pacify him and to see if we could help him and do something for him. He craved for somebody to be friendly with him and close to him. I really took a liking to him. We never had any arguments as long as I knew him, until I went on my vacation" in September.

On their first meeting Knoph also wanted help with respect to the title to his property and Baker took him across to the searching room in the court house to meet Bieber. Bieber not only made a search of two pieces of property owned by Knoph and his wife, but he checked certain easements and made sketches of them for Knoph without charge. Knoph also told Bieber about the trouble he was having with the county adjuster concerning a bill for his wife's board at Morris Plains. Bieber likewise saw Knoph about once a week, generally with Baker, though he visited Knoph on at least two occasions with his wife. Both Baker and Bieber were assiduous in cultivating their "client."

The matter of drawing a will for Knoph came up after Bieber had finished his search of the property. Baker's testimony makes it apparent that he realized that Bieber and he were treading on dangerous ground in drafting Knoph's will:

"He [Knoph] said that when Charley got through drawing up the papers on searching his property he wanted to know if we would take a little problem on for him. He wanted to draw a new will. He said that the contents would be about the same [as an earlier will which he had given to Baker] with a few changes. *I told him I couldn't do anything with the will.* I told him that I worked in the Surrogate's office and I also told him that he ought to get a lawyer, but he was very bitter on all lawyers. He said he would like *us* to do it for him. It was quite some time later that he went over to see Charley. I went over with him to see about the property, and I said, *'Charley will be in some trouble if he tries to make a new copy of the will.'* Charley said, 'We will wait until we get the other things done.' It was in the first part of June before Charley got to do anything about it. We went every week until the last part of June on that will, changing it."

Bieber likewise testified that he knew the risk he was incurring:

"Q. You knew, of course, that the preparation of a will is considered to be part of the practice of law, did you not? A. Well, I knew it to that extent, but I was in a position with this man— it was upon his insistence in helping him. I didn't drag him down to a lawyer's office.

Q. You knew a lawyer should draw a will when you told him that you would take him to a lawyer? A. I do. I have been in the title business.

Q. And notwithstanding that knowledge, you went ahead and drew this will and supervised its execution. Isn't that right? A. That's right."

The will which Baker and Bieber testified took several weeks to prepare occupied only one side of a single sheet of paper:

"IN THE NAME OF GOD, AMEN.

I, Walter Scott Knoph of the Borough of Mahwah, County of Bergen and State of New Jersey do make, publish and declare this my Last Will and Testament, hereby revoking any and every will by me heretofore made.

FIRST: I direct that all my just debts and funeral expenses be paid by my executors hereinafter named as soon after my decease as is practicable.

**Second:** I give, devise and bequeath to the following:

George Marrice, my wife's brother, of 8413 Beamley Ave., Los Angeles, California, $50.00.

George Marrice, Jr., of 8413 Beamley Ave., Los Angeles, California, $50.00.

Mrs. Arthur G. Smith, my wife's sister, of 297-15th St., Brooklyn, N. Y. $50.00.

David E. Rocher, Airmount Rd., Mahwah, N. J. $50.00.

Airmont Luthern Church, Airmont, N. Y., $100.00.

St. James Church, Ramsey, New Jersey $25.00.

Ethel Jinks, Mineola, N. Y., $25.00.

Jessie Wieber of Schenectady, New York, $25.00.

Fred Lorenz of Mahwah, New Jersey, $200.00, and Mr. and Mrs. E. A. Roberts or surviver, of Ramsey, New Jersey, $50.00.

Should any of the beneficiaries under this will, object to the probate thereof, or in any wise, whether directly or indirectly, contest, or aid in contesting the same or any of the provisions thereof, or the distribution of the whole, or any part of my estate, thereunder, then, in every such event, I annul any bequest herein made to such beneficiary, and it is my will that such beneficiary shall be absolutely barred and cut off from any share in my estate.

I hereby give and devise and bequeath unto my Executors herein named, the full power and authority to sell and convey any and all real estate, whereof I may die seized at such times and for such prices as they may consider for the best interest of my estate. I also give _____ for perpetual care of my Cemetery lot at Airmont Cemetery, Airmont, New York. All the rest, residue and remainder of my estate real, personal and mixed I do give, devise and bequeath to Walter J. Baker and Charles E. Bieber, absolutely.

Lastly, I nominate and appoint my two faithful friends Walter J. Baker and Charles E. Bieber Executors of this my last Will and Testament, and I further direct that my said Executors shall not be required to give any bonds for the faithful performance of their duties in any court or jurisdiction.

In Witness Whereof, I have hereunto set my hand and seal this 6th day of June, 1951.

Walter Scott Knoph _____ (L.S.)
WALTER SCOTT KNOPH

Signed, sealed, published and declared by the said WALTER SCOTT KNOPH, the testator above named, as and for his Last Will and Testament in the presence of us who were both present at the same time and who at his request, in his presence and in the presence of each other, have hereunto subscribed our names as witnesses, on this _____ day of _____, 1951.

WITNESSES:

Melvin Litchult residing at Suffern, N. Y.

Edna Litchult residing at Suffern, N. Y.

Theresa A. Hughes residing at River Edge, N. J."

Passing the failure to date the attestation clause, it will be observed that the amount of the bequest for the perpetual care of Knoph's cemetery lot is left blank and that the residuary clause is carefully tucked away in a paragraph dealing with other matters. Baker's story as to how his name and Bieber's got into the will as executors is fantastic:

"Well, next to the last time that we went up there, he didn't have any executors for the will. He said he would have two witnesses, but no executors. We insisted that he should get some. The next to the last time we went up there, *I* had the will drawn up, and he wouldn't consent to the executors * * * He said, 'Why don't you go on the will?' Charley said, 'I will go on it if you can't get anybody to help you out.' I said, 'No.' He said, 'Look, you have been my closest friends, and if you are going to help me if I am sick, why don't you help me now? I would rather have the two of you.' I thought it was a good thing and I consented to be one of the executors."

His only explanation of how he became a residuary legatee is equally meaningless: "On the ground that we had to dispose of some property if he got sick or something, to be used because there was no money." This is hardly satisfactory justification for taking over the estate of a man one had only met a few months before.

Baker's story of the execution of the will is likewise unbelievable. He insists that Bieber and he went up to see Knoph each week until the end of June. When shown the will dated June 6 he testified, "that was signed on the 9th of June. It was prepared on the 6th." Shown that "it states the 6th," he unhesitatingly answered, "It is the 6th then." Asked where the will was made known to Knoph he says, "Some time in his kitchen. It was twice in the kitchen and, I think, once on the back porch. The final one was read on the front porch at 4 o'clock in the afternoon of the day it was signed." Baker is obviously referring to the reading of different drafts of the will. Actually the will was executed by Knoph at the home of his friends, Mr. and Mrs. Melvin Litchult, in Suffern, New York, in the presence of both

Baker and Bieber with Theresa A. Hughes, who was produced by Bieber and who was up to that time unknown to Knoph, as the third witness.

Bieber took the will to the surrogate's office and turned it over to Baker, but Baker did not lodge it with the other wills filed there for safekeeping. Instead he put it with the stationery. Contrary to the practice of the office, no record was made of the filing of the will, nor was the customary fee charged. When Knoph demanded it back by a letter dated July 27 (what Baker refers to as a communication "with a 30 cent stamp on it") Baker took the will from the surrogate's office and gave it to Bieber. Knoph testified that "possibly 20 times I tried to get it," and failing he went to see Surrogate Dutcher in the first week of August. When the surrogate could not find the will, he called Baker, who was then on vacation, and Baker promised to get in touch with Bieber. It took several meetings of the surrogate and Mr. Phyley, who had been retained in the meantime by Knoph, with Bieber before Bieber delivered to Mr. Phyley various letters and a sealed envelope containing the will and power of attorney. In all nearly two months elapsed between Knoph's demand for his will and its return to his attorney. Neither Baker nor Bieber revealed to Surrogate Dutcher that they had done anything beyond drafting and attending to the execution of the will. When Mr. Phyley apprised the surrogate of the true facts, he called Baker and Bieber together. He testified that "I have been informed that the will not only made them executors, that they had not only provided themselves with a power of attorney, but what appeared to be a very serious matter, they had named themselves as residuary legatees. I told them that that put an entirely different light on the matter and that I would have to take some action." Neither of them denied to the surrogate that they had prepared the will. The next day the surrogate suspended Baker as deputy surrogate.

The power of attorney drafted by Bieber is as peculiar as the will. Some of its oddities may be indicated by italics:

"KNOW ALL MEN BY THESE PRESENTS that I, Walter Scott Knoph of the Borough of Mahwah, County of Bergen and State of New Jersey have made constituted and appointed and by these presents do make, constitute and appoint my two faithful friends, Walter J. Baker of Hasbrouck Heights and Charles E. Bieber of Bogota, both of the County of Bergen and State of New Jersey, my true and lawful attorneys to handle my estate in case of the uncertainty of my conditions. Being of ill health, it is therefor I appoint Walter J. Baker and Charles E. Bieber my attorneys and Guardians to take care of me.

I hereby give and grant unto my attorneys full power and authority to do and perform any and thing whatever requiste and necessary to be done in and about the premisses as fully to all intents and purposes as I might or could do if personally present hereby ratifying and confirming all that my said attorneys shall lawful do by virtue hereof without authority however to delegate to another any of the powers hereby conferred on them.

This power shall not be in affect, until such time when I will be unable to take care of myself.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 28th day of May, 1951

Walter Scott Knoph (L.S.)
WALTER SCOTT KNOPH

Signed, sealed and
delivered in the
presence of
 Harold Hibbard"

Baker's explanation of this extraordinary document is as unsatisfactory as his explanation of the will:

"As I said, his sister-in-law threatened to send him to Morris Plains. He was very much afraid of that. He said that he didn't send his wife there. The purpose [of the power of attorney] was in case he got sick and wasn't able to take care of himself. He wanted to know how we would take care of him. We told him that we couldn't do anything for him unless he had some sort of paper giving us the right. If his mind wasn't right—if he couldn't take care of himself—then he agreed to have a power of attorney drawn and had Mr. Bieber draw it for him."

██ We have merely summarized the chief points in the testimony of the respondents. It would serve no purpose to detail their conflicting, evasive and incredible testimony. Out of the welter, however, several pertinent facts stand forth

beyond the possibility of contradiction: (1) Baker and Bieber knew full well the physical weakness and mental infirmities of their "client," but they nevertheless pursued him week by week over a period of several months for their own advantage. (2) By their own admissions they realized that in drafting and attending to the execution of the will and the power of attorney they were engaging in the practice of law without a license so to do. They were fully aware of the risk they were running and notwithstanding they elected to run the risk. They cannot plead innocence. (3) When trapped in their nefarious scheme to grab Knoph's estate, they still did not repent and surrender the will but endeavored for almost two months to retain it. (4) Baker took advantage of his official position as Deputy Surrogate of Bergen County and, as such, as Deputy Clerk of the Probate Division of the Bergen County Court, and Bieber took advantage of his place of work in the court house to impose on Knoph. (5) In Knoph's eyes they were partners; in his correspondence he refers to them as such and he addresses several letters to them jointly, although Baker is revealed in the correspondence as the 'party of the first part' in Knoph's eyes. There can be no doubt that the two men were conspirators in a fraudulent and illegal adventure. Such a course of conduct not only vitiates the will and the power of attorney (see *In re Heim,* 136 *N. J. Eq.* 138 (*E. & A.* 1944)), but if pursued by a member of the bar would call for the severest discipline.

## II.

Baker's first argument by way of defense is that he did not draw the will or the power of attorney but both were prepared by Bieber, who supervised their execution. Baker, however, as we have seen, was an active participant in the discussions which led to the successive drafts of the will and he was present when the will was finally executed. It is to Baker that Knoph wrote on May 30, telling him that the two witnesses were "ready to sign the will any evening that suits you to come up," and Baker at least a dozen times in his

testimony used the word "we" or "us" in referring to Bieber and himself in connection with the drafting and execution of the will. Baker even undertook to advise Knoph as to how he could have the will changed: "Yes, even without the will you can draw up a new one. The last dated will counts, or you can add something to it, but you have to go through the same procedure with it." In the face of these clear facts the argument has no merit. There can be no doubt that Knoph was looking to Baker as much as to Bieber in connection with the preparation of the will.

 Baker next contends that this court has no authority to punish the unauthorized practice of the law, claiming that *R. S.* 2:111–1, making the unlawful practice of the law a misdemeanor, is the sole remedy and citing *In re Frederick Bugasch, Inc.,* 12 *N. J. Misc.* 788 (*Sup. Ct.* 1934) as authority. But the *Bugasch* case does not stand for the proposition that the former Supreme Court was without jurisdiction to punish the unauthorized practice of the law by contempt; it merely holds that in the circumstances of that particular case it would not employ the remedy of punishment by contempt, the court explaining "it is a power that is not and should not be exercised lightly" (*p.* 791), a holding with which we are in entire accord. Although the power to punish the unauthorized practice of the law has never been considered in a court of last resort in this State, it was conceded, as we have seen, in the *Bugasch* case in the former Supreme Court and upheld in the former Court of Chancery in *New Jersey Photo Engraving Co. v. Carl Schonert & Sons, Inc.,* 95 *N. J. Eq.* 12 (1923) where Chancellor Walker held:

"Practicing law in our state, without being duly licensed, is not only a contempt of court, to be prosecuted in a separate proceeding— *In re Merrill,* 88 *N. J. Eq.* 261, 267, for which the offender may be adequately punished by the court in which the offense is committed, but by supplement to the Crimes Act of 1913 (*P. L.* 358; *Comp. Stat.* 1*st Supp.* 450, § 60), it is made a misdemeanor."

Neither of these decisions was appealed to the court of last resort, nor has their declaration of the power of the courts

to punish by contempt proceedings the unauthorized practice of the law been questioned.

It now becomes necessary for us to examine into the power of the Supreme Court to punish for contempt those engaged in the unauthorized practice of the law. It is generally conceded throughout the country that the power to control admissions to the bar and to discipline members of the bar is inherent in the judiciary. Here these powers have been expressly conferred on the Supreme Court by *art. VI, sec. II, par.* 3 of the Constitution: "The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted." But whether inherent or express, these powers over the admission and discipline of members of the bar would be meaningless and futile if laymen might practice law with impunity. The damage which would overtake the public from permitting such unauthorized practice of the law is strikingly illustrated in the present case. The reason for prohibiting the unauthorized practice of the law by laymen is not to aid the legal profession but to safeguard the public from the disastrous results that are bound to flow from the activities of untrained and incompetent individuals, assuming to practice a learned profession which entails years of preparation and without being bound by the high standards of professional conduct and integrity which are imposed on members of the bar by the Canons of Professional Ethics, which are zealously enforced by the courts for the public good.

The power to control admissions and to discipline the members of the bar necessarily carries with it the power to prevent laymen from practicing law. In Vermont it was provided by statute (*Gen. Laws* 1591), rather than by constitution as here, that "Justices of the Supreme Court * * * shall make, adopt and publish and may alter or amend rules regulating the admission of attorneys to the practice of law before the courts of this state." When called upon in the case of *In re Morse,* 98 *Vt.* 85, 126 *A.* 550 (1924), to determine its power under the statute to punish for contempt one

who practiced law without being licensed, the Supreme Court of that state held:

"The rule of constitutional interpretation announced in *M'Culloch v. Maryland*, 4 *Wheat.* 316, 4 *L. E.* 579, that that which was reasonably appropriate and relevant to the exercise of a granted power was to be considered as accompanying the grant, has been so universally applied that it suffices merely to state it, and, as there is nothing in the inherent nature of the power to deal with contempt which causes it to be an exception to such rule, there can be no reason for refusing to apply it to that subject. * * *

That the express legislative grant to this court of exclusive and full authority to determine who shall practice as attorneys before the courts of this state carries with it the implied power to do whatever may be reasonably necessary to make such grant effective, even to punishing for contempt those pretending to such office, cannot be doubted. Otherwise the act of the legislature is nugatory."

The reasoning of the Vermont court is especially applicable here in view of the constitutional grant to our court of the "jurisdiction over the admission to the practice of law."

■■ Even in the absence of express powers, the judiciary has the inherent power to regulate the practice of law and punish for contempt those who practice without authority. Thus the Supreme Court of Illinois in the case of *People v. Peoples Stock Yard Bank*, 344 *Ill.* 462, 176 *N. E.* 901 (1931), in punishing the respondent for contempt of court for engaging in the unauthorized practice of law, stated:

"Having inherent and plenary power and original jurisdiction to decide who, shall be admitted to practice as attorneys in this state, this court also has all the power and jurisdiction necessary to protect and enforce its rules and decisions in that respect. Having power to determine who shall and who shall not practice law in this state, and to license those who may act as attorneys and forbid others who do not measure up to the standards or come within the provisions of its rules, it necessarily follows that this court has the power to enforce its rules and decisions against offenders, even though they have never been licensed by this court. Of what avail is the power to license in the absence of power to prevent one not licensed from practicing as an attorney? In the absence of power to control or punish unauthorized persons who presume to practice as attorneys and officers of this court the power to control admissions to the bar would be nugatory. And so it has been held that the court, which

alone has authority to license attorneys, has as a necessary corollary ample implied power to protect this function by punishing unauthorized persons for usurping the privilege of acting as attorneys."

Nor does *R. S.* 2:111–1 denominating the unauthorized practice of law as a misdemeanor in any way interfere with· or prevent this court from exercising its power to punish for contempt persons guilty of such conduct. Laymen may be punished for contempt of court for conduct which is also punishable in criminal proceedings, *In re Hendricks*, 113 *N. J. Eq.* 93 (*E. & A.* 1933), just as lawyers may be disciplined by the court for acts which are crimes. Penal statutes are an aid to and not a limitation upon the exercise by the judiciary of its power to regulate the practice of law. This has been made clear by the courts of our sister states. In *People v. Goodman*, 366 *Ill.* 346, 8 *N. E.* 2d 941 (1937), *cert.* denied, 58 *S. Ct.* 49, 302 *U. S.* 728, rehearing denied, 58 *S. Ct.* 138, 302 *U. S.* 777, the Supreme Court of Illinois said:

"The power to regulate and define the practice of law is a prerogative of the judicial department as one of the three ·divisions of the government created by article 3 of our Constitution. The legislative department may pass acts declaring the unauthorized practice of law illegal and punishable. Such statutes are merely in aid of, and do not supersede or detract from, the power of the judicial department to control the practice of law. (citations) The power is inherent in this court to prescribe regulations for the study of law and the admission of applicants for the practice of that profession. (citations) It follows, as an incident to such power, that this court has jurisdiction to discipline or disbar, for cause, attorneys licensed by it. It would be an anomalous situation if a layman actively engaged in the practice of law, in defiance of the requirements necessary therefor announced by this court, could stay the hand of the court from suppressing his illegal acts. The practice of law, both in courts and out of courts, by one not licensed, is an illegal usurpation of the privilege of an attorney and is a contempt of this court. (citations)"

Similarly the Supreme Court of Rhode Island in *Rhode Island Bar Ass'n. v. Automobile Service Ass'n.*, 55 *R. I.* 122, 179 *A.* 139 (1935) held:

"It is not necessary, in order to sustain the power of the court, to hold that the Legislature cannot also act to prevent the evils to the public that inevitably arise from unauthorized practice of the law. In the exercise of the police power it undoubtedly can legislate in this matter. The statute, therefore, cannot avail these respondents if their admitted acts are within the field of practice of the law. Stripped of all extraneous issues, that is the real question before us in this proceeding. If the acts complained of by the petitioners, and admitted by the respondents, are found to amount to the practice of law, then summary action will be in order as prayed for by the petitioners."

Not only are the cases above referred to impregnable in their logic and reasoning, but they are representative of the weight of authority in this country to the effect that the unauthorized practice of law is punishable in contempt proceedings even though such conduct may also constitute a statutory offense. *7 C. J. S., Attorney and Client*, § 16, P. 726; *Attorneys at Law, 5 Am. Jur.* 262, § 2, 272, §§ 17–18; *Brand, Unauthorized Practice Decisions* (1937), *xii*.

 Bieber, who admittedly prepared the will and power of attorney in question, contends that he was not engaged in the practice of law so as to be subject to punishment for contempt of this court (1) because his acts did not constitute "a course of conduct," (2) because he received no compensation for his services, (3) because in preparing the instruments in question he was acting *pro se*, and (4) because his services were rendered out of court and so did not constitute an interference with judicial proceedings. We cannot agree with these contentions. To concede that the practice of law is subject to such limitations would be but to invite the unqualified and rapacious to prey upon the public and to deny the public the protection in such matters which it has a right to expect from this court.

In the instant case it is clear that both Baker and Bieber were engaged in a "course of conduct" extending over a period of several months during which they advised Knoph with respect to legal matters and in accordance with such advice prepared for him two peculiar legal documents of

far-reaching importance in the life of Knoph. Each of these
documents very obviously should not have been prepared by
one who did not have a knowledge of law. We do not con-
sider it to be necessary that a person be engaged in a "course
of conduct" over a period of time in order to be engaged in
the practice of law. To impose such a test would result in
the wholly absurd situation of this court being called upon
to determine how many wills a layman may draw, or how
many "clients" he may advise, or, more bluntly, how many
times he may defraud the public by his impositions before he
be deemed to be engaged in the practice of law and thus
subject to the superintending power of this court. We are of
the firm opinion that a single act, e. g., the preparation of a
will or the drawing of a power of attorney, may in appropriate
circumstances constitute the practice of law. There is no
sound reason why the doing of a single act calling for the
skills and learning of an attorney does not constitute the
practice of law just as most certainly the performance of a
single operation by a surgeon constitutes the practice of
medicine. The amateur at law is as dangerous to the commu-
nity as an amateur surgeon would be.

The contention that Baker and Bieber were not
engaged in the practice of law because they charged no fee for
their services could be adequately disposed of merely by
pointing out that compensation may be expected and received
in forms other than cash. Their action in making themselves
residuary legatees of an estate which they had reason to
believe might return to them several thousand dollars apiece
can hardly be characterized as gratuitous. The more com-
plete answer to this argument, however, is well expressed by
the Nebraska Supreme Court in the case of *State ex rel.
Wright v. Barlow,* 131 *Neb.* 294, 268 *N. W.* 95 (1936):

"Defendant insists that to constitute the practice of law one must
hold himself out as a licensed attorney and receive a fee for his
service. We think that this claim is not well founded. One may
represent a client in court, draw the pleadings for his client's cause
and actually try it in court without receiving a fee for such service.

Certainly, no one would contend that such acts do not constitute the practice of law. It is a matter of common knowledge that attorneys are appointed by the federal courts to defend indigent persons, charged with crimes in such courts, and that they render such service without compensation. It can scarcely be said that the defense of a person charged with a crime in the federal court is not the practice of law. It might as well be said that a surgeon who performs, without fee or reward, a tonsillectomy or appendectomy is not practicing surgery. Other authorities, holding to the effect that the charging and receiving of a fee is unnecessary to constitute the practice of law are *Ferris v. Snively*, 172 *Wash.* 167, 19 *P.* (2d) 942, 90 *A. L. R.* 278; *People v. Association of Real Estate Tax Payers*, 354 *Ill.* 102, 187 *N. E.* 823."

The soundness of this position is the more evident if it is borne in mind that the underlying purpose of regulating the practice of law is not so much to protect the public from having to pay fees to unqualified legal advisors as it is to protect the public against the often drastic and far-reaching consequences of their inexpert legal advice.

 The attempt to take refuge behind the well recognized right of persons to represent themselves in legal matters is of no avail to Baker and Bieber here. The penalties resulting from the unauthorized practice of law cannot be avoided merely by a showing that as a result of such practice an interest was acquired in the subject matter of the transaction involved. Neither Baker nor Bieber had any interest in Knoph or in his property which would permit them to prepare for him a will and a power of attorney and advise him with respect thereto. The fact that they projected themselves into the documents they prepared does not exculpate them from charges of the unauthorized practice of law but only tends to compound their offense. Only a dullard would ever be found guilty of engaging in the unauthorized practice of law if its consequences could be avoided merely by preparing for and having the "client" execute a document designating the unlicensed practitioner an "attorney-in-fact."

 With respect to the assertion that the acts performed were out of court and therefore did not constitute the unauthorized practice of law, it will suffice to refer to our

recent decision in *Stack v. P. G. Garage, Inc.*, 7 *N. J.* 118, 120–121 (1951) in which we stated:

"In determining what is the practice of law it is well settled that it is the character of the acts performed and not the place where they are done that is decisive. The practice of law is not, therefore, necessarily limited to the conduct of cases in court but is engaged in whenever and wherever legal knowledge, training, skill and ability are required."

The respondents assert that the presentment does not charge them with fraud but merely with the preparation of a will and a power of attorney. They would have the court in passing on the matter ignore their nefarious conduct in imposing on an aged and friendless man, who thought to his subsequent disillusionment that he had a right to rely on a public official and a man who transacted his business in a courthouse. Here as in all other cases where a court is called upon to mete out punishment, we are bound to take in consideration all of the facts bearing on their offense. Nor are Baker and Bieber to be exonerated because they were detected in their fraudulent scheme to acquire Knoph's estate before they could profit by their machinations. They claim, moreover, that they have not been given an adequate hearing, but there is no merit to the contention. When the depositions were taken, they had the right to cross-examine, and did cross-examine, the prosecution's witnesses. The case involves no real conflict of testimony. Baker and Bieber could well be convicted by the testimony they gave on direct examination. Confronted with the facts on the depositions taken by the prosecution they could not deny the charges; instead they merely sought ineffectively to justify and excuse.

While the inherent power of the judiciary to punish for contempt is a necessary one, it is also one that will not need to be exercised frequently. It is not to be anticipated that many laymen will be as brash and as overreaching as Baker and Bieber. Moreover, "In trivial or unimportant instances of illegal practice of the law, it should not be used,"

*Rhode Island Bar Ass'n. v. Automobile Service Ass'n., supra,*
55 *R. I.* 122, 179 *A.* 139 (1935), nor should the power be
exercised where the legal services have been rendered out of
necessity. We consider the conduct of Baker and Bieber,
however, to be in flagrant disregard of the jurisdiction of this
court and of a particularly culpable and dangerous nature.
We therefore adjudge each of them to be in contempt of this
court and impose upon each of them by way of punishment
a fine of $250 and costs to be paid within 15 days from the
handing down of this opinion. If the fine and costs are not
paid as directed, the prosecutor should bring the matter to
the attention of the court.

CASE, J. (dissenting). Criminal contempt is a summary
proceeding which operates in derogation of human liberties.
It should not be used except when reasonably necessary to the
vindication of the authority and the prestige of the court.
This is not such a case. The reasoning which brings me to
that conclusion is as follows.

What is the essence of the charge against the respondents?
Is it that they drew a power of attorney and a will and in so
doing did that which they, not being licensed to practice law,
had no right to do? That and nothing more? It is now
rather generally accepted that the courts, under their con-
tempt powers, have authority to punish those who without
right practice law; and if the objective of the prosecution is
as thus circumscribed then the authority of the court to
initiate the proceeding is clear and the issues are, whether
the acts so alleged constitute unlawful practice, whether,
having the authority, the court should, in wise discretion,
exercise it, and, finally, whether the respondents, either or
both, committed the acts of which they are accused. If, on
the other hand, the circumstances of the case are such that
the acts charged do not constitute unlawful practice, or their
character as such is so problematical as to make them a mere
technicality, and the real burden of the charge is that the
respondents perpetuated a fraud upon or took an unconscion-

able advantage of another, then the court, for reasons which I shall state, ought not to proceed as upon a contempt, because no one, lawyer or otherwise, is licensed to perpetrate a fraud, and the proceeding becomes in effect the prosecution of an offense against society, in other words, a prosecution for crime, without semblance of conformance with our criminal processes. In any event the court should, in my opinion, avoid resort to its arbitrary power over contempts unless the case is clear, the need urgent and there is no other adequate course.

The proceeding is criminal and punitive in its nature. *In re Frederick Bugasch, Inc.,* 12 *N. J. Misc.* 788 (*Sup. Ct.* 1934); *In re Merrill,* 88 *N. J. Eq.* 261 (*Prerog.* 1917). The power to adjudge in contempt "is a power which may be * * * followed by an imprisonment for a year, or a longer term, as well as for a single day." *Rhinehart v. Lance,* 43 *N. J. L.* 311 (*Sup. Ct.* 1881). If, as is charged, the respondents practiced law without a license, they are, entirely independent of this proceeding, guilty of a criminal offense, *R. S.* 2:111–1, *et seq.,* and are punishable thereunder:

"2:111–1. Any person not licensed as an attorney or counselor at law * * * that shall: (a) Engage in this state in the practice of law * * * Shall be guilty of a misdemeanor.
* * * * * * * *
2:111–3. The term 'practice of law' as used in this chapter shall include the engaging in the practice of preparation of wills or conveyances."

Our courts have repeatedly said that practicing law without a license is a criminal offense and may be prosecuted in the way usual to the punishment of crimes under the statute. *In re Frederick Bugasch, Inc., supra; N. J. Photo Engraving Co. v. Schonert & Sons,* 95 *N. J. Eq.* 12, 15 (*Ch.* 1923). An accusation under the statute would follow the course which has been provided and jealously maintained for the protection of one criminally accused, including indictment by a grand jury, trial before a petit jury which, in appraising truth and falsehood, sees and hears the witnesses in a trial

presided over by a judicial officer according to the rules of evidence, and the right of appeal from a conviction. None of those rights or protections are accorded the respondents in this proceeding. On the contrary, the court indicts, prosecutes, tries the case on a paper transcript of testimony, adjudges guilt, imposes unrestricted sentence, and is subject to no appeal.

I do not suggest that the practice here followed is unusual in strict contempts or that a criminal contempt is *per se* a criminal proceeding within the application of *art. I, par.* 8, and related paragraphs, of our Constitution. That is just the point; it is a proceeding *sui generis*, it includes offenses easily committed, is a remedy easily used, it is not geared to our conception of a trial for crime, and it should be limited to those inherent and urgent needs which are its reasons for existence. As Chief Justice Taft said in *Ex parte Grossman*, 267 *U. S.* 87, 69 *L. Ed.* 527 (1925):

"The power of a court to protect itself and its usefulness by punishing contemners is of course necessary, but it is one exercised without the restraining influence of a jury and without many of the guaranties which the bill of rights offers to protect the individual against unjust conviction."

The contempt in the *Grossman* case lay in the flouting of a court order. Manifestly, the need for summary action recedes correspondingly as the offense becomes more distantly related to the court or any of its orders. There is real danger that an unwise use of the autocratic power to adjudge in contempt may ultimately reach an end quite far from the target.

The procedure herein has been as follows: The Bergen County Committee on the Unauthorized Practice of Law laid before the court an unverified paper made upon information and centering upon the statement that Bieber drew a will which Knoph executed and in which were various bequests, a residuary gift to Baker and Bieber and a clause naming these men as executors, and that Bieber also prepared and had Knoph execute a power of attorney over his property

naming Baker and Bieber as attorneys in fact to act if Knopf should become mentally incompetent. Upon that informal presentation this court made an order directing Baker and Bieber to show cause why they should not be adjudged guilty of contempt of court for bringing the administration of justice into disrepute and for the unauthorized practice of the law and why they should not be punished therefor, appointing an attorney to prosecute the matter and present the same to the court, and directing that depositions be taken upon notice. In accordance with that order depositions were taken in the presence of the respondents and their respective attorneys as well as of the prosecutor for the court before a person who was a notary public and certified shorthand reporter but who had no authority except to swear witnesses, take down stenographically what was said and certify the transcript. On that transcript the court heard arguments of counsel and came to its conclusion both as to guilt and sentence. The court has at no time seen the respondents or any of the witnesses; it has had no report as from a referee or master either upon the finding of facts or otherwise. From the determination thus made there is no appeal. Upon the sentence to be pronounced there is no limit. The power which the court has exercised is vast and irresponsible. I use the word "irresponsible" in the sense that the court's findings are absolute and beyond review unless there be some federal constitutional question involved.

No charge of conspiracy or other fraud is laid against the respondents. The presentment contains nothing which, within that rule of certainty to which a person accused of crime is entitled, may be considered as such. It charges that Bieber prepared both the power and the will. Bieber says that he prepared them. Baker says that Bieber prepared them and that he, Baker, did not. Bearing in mind that no conspiracy is charged, I find nothing upon which Baker may be adjudged guilty of an act of unlawful practice.

As to the power of attorney: Bieber drew the paper. Both he and Baker were parties to the transaction. It was upon

them that the power was conferred. Parties may draw instruments between themselves without committing illegal practice. That obviously is so. "A" borrows money from "B"; neither party is an attorney at law; but "B" draws a promissory note—a legal instrument—declaring the debt and its terms and stating the obligation to repay and has "A" sign it. No one will say that either has transgressed upon illegal practice. If "B" thereby in some way perpetrates a fraud upon "A," he is amenable to the law for his wrong. But the introduction of fraud does not make an illegal practice of the law that which without it is not such an act. I conclude that the drawing and executing of the power of attorney did not lay either of the respondents open to a charge of unlawful practice.

As to the will: Knoph knew that neither Baker nor Bieber was a lawyer. He also knew that one of those men drew the will which he executed. He wanted it that way. He was an eccentric who did not like lawyers and did not like his relatives well enough to leave them his little estate. He says that he did not know the will contained a paragraph leaving the residuary estate to Baker and Bieber. That I do not believe. By his own story he had solicited neighbors, of no kin, in the unsuccessful effort to persuade them to become his residuary legatees. The suggestion that the drawing of one will under such circumstances was an affront to the dignity of the court or would tend to discredit the esteem in which courts are held does not, I believe, have sufficient substance to hold its own weight. Of scarcely more force is the argument that such an isolated act, without earlier acts of like nature and without threat or likelihood of repetition, was a substantial encroachment upon the emoluments or the standing of the bar. Thus the activating reasons for proceeding under the extraordinary contempt power of the courts fade away. It is also to be remembered that the efforts of the accused men got no actual results and that Knoph is not the accuser.

There is grave question whether the act of drawing one will, particularly when the draftsman of the instrument is one of the executors and one of the residuary legatees, constitutes practice of the law. The Superior Court of Pennsylvania expressed the opinion that the preparation of one will by a trust company acting through an officer not authorized to practice law was not a violation of the statute prohibiting the unauthorized practice of law. *In re Umble's Estate,* 117 *Pa. Super.* 15, 177 *A.* 340 (1935). That is in line with the general rule that a single instance of drawing a legal instrument does not usually constitute unlawful practice and that the drawing of a paper in which the draftsman has an interest usually does not; "* * * the substance of the offense is the habitual preparation for a consideration of legal documents for others," *Childs v. Smeltzer,* 171 *A.* 883 (*Sup. Ct. Pa.* 1934); "to prepare as a business legal instruments and contracts," *People v. Alfani,* 227 *N. Y.* 334, 125 *N. E.* 671 (*N. Y. Ct. of Apps.* 1919), *People v. Weil,* 260 *N. Y. S.* 658, 237 *App. Div.* 118, (*N. Y. Sup. Ct., App. Div. 1st Dept.,* 1932); "* * * the occasional drafting of simple deeds, and other legal instruments when not conducted as an occupation or yielding substantial income may fall outside the practice of the law," *In re Opinion of the Justices,* 194 *N. E.* 313 (*Sup. Jud. Ct. Mass.* 1935).

It is recognized by courts generally that the power to convict and sentence on a contempt is an autocratic power which is to be used most sparingly and only in urgent instances. It was said by our Supreme Court, *Rhinehart v. Lance, supra,* that "the power to commit at discretion and for a discretionary term of imprisonment is a transcendent prerogative power * * * a power which, at best, is an arbitrary power, and liable to great abuses."

*In re Frederick Bugasch, Inc., supra,* has strong resemblance to the instant case. The Hudson County Bar Association, in cooperation with the Conference of the County Bar Associations, made application to reargue a rule to show cause why the defendants should not be adjudged in contempt

of the Supreme Court in that they practiced law without having been licensed to do so. The illegal practice, it was charged, consisted of service rendered by the defendants to the estate of a decedent in the probate of her will, preparing and filing inventory for inheritance tax purposes, and the drawing and recording of two refunding bonds and releases. The argument was made that the bar associations sought to impress upon the court that the cause was instituted as a part of a nationwide movement sponsored by the American Bar Association against unauthorized practitioners of the law. The opinion stated:

. "While the court is, of course, impressed and concerned with the efforts of all and particularly those of the bar associations, which have for its purposes the vindication and preservation of its powers, for they are wholesome and praiseworthy objectives, nevertheless we are of the opinion that we should not resort to or exercise the inherent, but none the less drastic and extraordinary, power and right of this court to punish, under all circumstances, those who appear to have committed an act or acts which may be construed as being in contempt of court. It is a power that is not and should not be exercised lightly."

The court proceeded to hold that under the facts and circumstances of the case it would not exercise "the mighty power" to punish the alleged wrongdoers by and through the process of contempt proceedings; that the prosecutors were not without a remedy; that if the defendants practiced law without a license they were guilty of a criminal offense and were answerable to the criminal laws of the state.

The rule as stated in the *Bugasch* case appears to be generally accepted in this country. *In re McCallum*, 57 P. 2d 1259 (*Sup. Ct. Wash.* 1936), was a proceeding in contempt based on the alleged illegal practice of the law without a license in preparing deeds, real contracts and mortgages. Inasmuch as the accused had desisted from that practice after the second warning from the state bar association the court refused to punish through the extraordinary process of contempt proceedings, especially since the court considered that the defendant, if guilty of practicing law without a license,

was punishable under the criminal laws of the state. The opinion quotes bodily so much of the *Bugasch* opinion, *supra*, as I have placed within quotation marks.

In *Rhode Island Bar Association v. Automobile Service Association*, 179 *A*. 139 (*Sup. Ct. R. I.* 1935), the bar association brought in a group of men doing business as Automobile Service Association to have them adjudged in contempt of court for the illegal practice of law. It appeared by the allegations of the petition and by the testimony given before the court that the respondents had held themselves out to perform various services under the headings of "Manslaughter," "State Laws, City Ordinances," "Damage Suits against Others," "Defense," "Legal Advice," "Hearings." The respondents admitted that they had performed such services, and it appears from the course of the decision that they proposed to continue the unlawful acts to the great wrong of the public and to the invasion of the ancient and exclusive rights and privileges of the bar unless the court intervened. The court determined that the case was one in which the unusual power over contempt should be exercised, but said:

"Nevertheless, we do not encourage it. In trivial or unimportant instances of illegal practice of the law, it should not be used. Where other remedies are available and efficient to right the wrong complained of, they should first be invoked, unless there is, as in the instant case, an evident need for summary action to protect the public and the jurisdiction of the court. This inherent power of the judiciary to punish for contempt is a necessary but also a dangerous power, and is therefore to be used with great caution. In this instance, the peculiar circumstances seem to call it forth to vindicate the jurisdiction and authority of this court over a matter that is intimately related to the administration of justice and that deeply affects the public welfare."

A case strongly relied upon as a precedent by the prosecutor herein is that of *People ex rel. Chicago Bar Ass'n. v. Goodman*, 8 *N. E. 2d* 941 (*Sup. Ct. Ill.* 1937). The ruling was upon a motion to strike the information which of course admitted the allegations. The accused had engaged in and was continu-

ing a large and profitable business in the collection and adjustment of workmen's compensation claims. The court held (italics inserted):

"It would be an anomalous situation if a layman actively engaged in the practice of law, in defiance of the requirements necessary therefor announced by this court, could stay the hand of the court *from suppressing his illegal acts.* The practice of law, both in courts and out of courts, by one not licensed, is an illegal usurpation of the privilege of an attorney and is a contempt of this court."

In all of the cases which I have found the acts said to have been a contempt of court were aggravated and continued beyond any reasonable comparison with the alleged acts of unlawful practice in the instant case. Among them are: *In re White,* 171 *Pac.* 759 (*Sup. Ct. Mont.* 1918); *In re Morse,* 126 *A.* 550 (*Vt. Sup. Ct.* 1924); *People ex rel. Chicago Bar Association v. Tinkoff,* 399 *Ill.* 282, 77 *N. E. 2d* 693 (*Ill. Sup. Ct.* 1948); *People ex rel. Illinois State Bar Ass'n. v. Schafer,* 404 *Ill.* 45, 87 *N. E. 2d* 773 (*Ill. Sup. Ct.* 1949); *People ex rel. Chicago Bar Ass'n. v. Barasch,* 406 *Ill.* 253, 94 *N. E. 2d* 148 (*Ill. Sup. Ct.* 1950). Many of the cases on the subject will be found noted, annotated or reviewed in 36 *A. L. R.* 533, 100 *A. L. R.* 236, 1951 *A. L. R.* Blue Book supplementing the last citation, 7 *C. J. S., Attorney and Client,* § 16. The matter is summed up in 7 *C. J. S., p.* 726, *Attorney and Client,* § 16(1), as follows: "Ordinarily the court will not resort to or exercise this drastic and extraordinary power unless necessary."

The chief function of a criminal contempt proceeding is to enable the court to guard its power, authority, dignity and integrity, *cf. In re Merrill, supra,* and because the court has authority over the admission of attorneys it may give effect to that authority by preventing the practice of law by those whom it has not licensed so to do. The proceeding, however, is the exercise of an extraordinary and arbitrary power which by reason of its incidents should be, and is, sparingly used. It has been exercised chiefly in instances where the dignity and the authority of the court and its writs are directly

involved and, seldom, where the offense lies in the doing of acts which are the exclusive privilege of an attorney at law.

I apprehend that my brethren are impelled to their conclusion by the conviction that the respondents conspired to victimize an old man to their unearned advantage, an act which is not licensed by any commission to practice law and which is not more an affront to the dignity of the court than is any offense against society. The cart should not be put before the horse. The primary question is whether there has been unlawful practice and whether the unlawful practice was such as to warrant resort to a contempt proceeding. The unconscionable incidents bear properly upon the extent of punishment and not upon the technical guilt of unlawful practice. I agree that a criminal fraud, if it exists, should be punished, but I consider that since it, and not any of those incidents which are the peculiar justification for the exercise of the court's drastic power of contempt, is the weight of the accusation, the conviction should be reached in the way that convictions for other offenses against society are reached, namely, by the processes of our criminal law. Only in that way can the right of a defendant to a fair trial on a criminal charge in accordance with the spirit of our constitution and laws be maintained. It is well to recall that the application of the contempt power to the acts of unlicensed persons in practicing law is a modern extension of the doctrine of contempts and is like unto nothing in any other profession or walk in life. Consider, for illustration, the great profession of medicine, the unlawful practice of which contains an equal threat to the emoluments of licensed practitioners and perhaps a greater threat to the safety of the public. The State Board of Medical Examiners has authority to grant and to revoke licenses, *R. S.* 45:9–16, but not to penalize unlawful practice. Technical violations are prosecuted by summary suit in court on the complaint of the board, *R. S.* 45:9–22; but offenses against society as such, whether by licensed or unlicensed persons, follow the usual criminal course, as abortion, *R. S.* 2:105–1.

I conclude that Baker has not been shown to have drawn either instrument; that the power of attorney, since it was drawn by one of the parties to the transaction, was not the practice of law; and that the will presents a question of doubt. On the whole case I believe there is not justifiable reason for pursuing the drastic procedure of criminal contempt, that there is an adequate remedy in the processes of the criminal courts and that the precedent clearly set in the *Bugasch* and the *McCallum* cases, *supra,* should be followed. Perhaps I should add that my impression received from the typewritten transcript upon which we must exclusively rely is that Knoph was an evasive, forgetful and altogether unconvincing witness; and at the same time he was a vital witness on the question of over-reaching. This, as much as anything else, leads me to conclude that there should be a trial in the usual course.

The lightness of the penalty does not atone for a mistaken procedure. The precedent establishes the principle. The punishment in the next case may be an extended imprisonment.

I therefore favor a dismissal of the proceedings and a direction to place the matter in the channels of the criminal law.

*For guilty*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING and ACKERSON—5.

*For not guilty*—Justice CASE—1.

*For guilty as to Bieber. Not guilty as to Baker*—Justice OLIPHANT—1.