No. 86,855

In the Matter of STEPHEN PAUL FLACK, *Respondent.*

(33 P.3d 1281)

Opinion filed October 26, 2001.

*Alexander M. Walczak*, deputy disciplinary administrator, argued the cause, and *Stanton A. Hazlett*, disciplinary administrator, was with him on the formal complaint for petitioner.

*Laurie DelPercio*, of Brown & James, P.C., of Kansas City, Missouri, argued the cause for respondent, and *Stephen Paul Flack*, respondent, argued the cause pro se.

*Per Curiam*: This is an uncontested attorney discipline case filed by the office of the Disciplinary Administrator against the Respondent, Stephen Paul Flack, an attorney licensed to practice law in the state of Kansas. The complaints alleged that the Respondent violated KRPC 1.4(b) (2000 Kan. Ct. R. Annot. 320) (communication); KRPC 1.5(a) (2000 Kan. Ct. R. Annot. 330) (fees); KRPC 1.14(a) (Kan. Ct. R. Annot. 359) (client under disability); KRPC 1.15(b) (2000 Kan. Ct. R. Annot. 360) (safekeeping property); KRPC 1.16(d) (2000 Kan. Ct. R. Annot. 371) (declining or terminating representation); KRPC 5.3(b) and (c) (2000 Kan. Ct. R. Annot. 404) (responsibilities regarding nonlawyer assistants); KRPC 5.5(b) (2000 Kan. Ct. R. Annot. 406) (unauthorized practice of law); KRPC 7.3(b) and (c) (2000 Kan. Ct. R. Annot. 412) (direct contact with prospective clients); and KRPC 8.4(c), (d), and (g) (2000 Kan. Ct. R. Annot. 420) (misconduct). Respondent stipulated to the facts as alleged in the formal complaint and the supplement to the formal complaint, as well as to the violations of the respective rules of Kansas Rules of Professional Conduct. The Disciplinary Administrator recommended to the hearing panel (panel) a 2-year supervised probation with a public censure.

FACTS:

Respondent entered into a services agreement with ALMS, Ltd., a Dallas, Texas, company whereby he agreed to have ALMS,

through its client service representatives and other affiliations, send mass mailings to a targeted group of residents in Kansas and Missouri soliciting trust, will, power of attorney, and asset transfer document preparation and other services to be performed by Respondent as an attorney licensed in Kansas and Missouri. Respondent knew that ALMS was affiliated with Addison Group and Addison Insurance Marketing, both of Dallas, Texas, and Advanced Legal Systems. Respondent also knew that the four entities had offices in Leawood, Kansas.

Under the service agreement with ALMS, Respondent paid on a weekly basis for each verified appointment with a prospective client made by ALMS or the client service representative. Respondent knew that the client service representatives used his name and acted on his behalf while they were employed either by ALMS, Addison Group, Addison Insurance Marketing, or Advanced Legal Systems. The client service representative collected an attorney fee of $1,995 from prospective clients. Of the $1,995 attorney fee, Respondent paid $1,745 per completed trust to ALMS.

Respondent did not know the identity of the people on ALM's mailing list and was unaware of a client's existence until after the client services representative had interviewed the prospective client, secured his or her signature, and collected the attorney fee from the client. Respondent knowingly authorized ALMS and the client service representatives to use his name to conduct client interviews; provide explanations of the different types of trusts, wills, powers of attorney and other legal documents; and obtain signatures and attorney fees prior to Respondent knowing the identity of the client. ALMS prepared and printed all the marketing material as well as the forms for the trust, will, and power of attorney documents in the name of Respondent. The materials were later sent to Respondent for his use.

The client service representatives were nonlawyers and were employed and trained by ALMS, Addison Group, or Advanced Legal Systems. Respondent exercised little or no supervision over the client services representatives.

### Complaint of Coleene Partain

On January 4, 2000, John Thomsen, an ALMS client service representative, went to the home of Coleene Partain, 68 years of

age and widowed. Partain had responded to the unsolicited mailing of Respondent concerning estate planning for the purpose of avoiding probate. Respondent's mailing did not state "Advertising Material." Thomsen obtained Partain's signature on a disclosure statement and agreement; acquired financial information concerning insurance, real estate, and stocks; provided advice and explanations of the various legal instruments offered by Respondent, and collected a check for $1,995 for attorney fees payable to Respondent. Thomsen advised Partain that another service representative would deliver completed estate planning documents and review them with her.

The following month, Marcel Fenech, Vice President of Marketing for ALMS and Vice President of Addison Insurance Marketing, Dallas, Texas, brought and reviewed with Partain a completed living will, pour-over will, revocable living trust, and two powers of attorney prepared by Respondent. Fenech took Partain to a bank. He instructed Partain to sign the legal instruments that were then witnessed and notarized by bank employees. On the same day, Fenech advised Partain to sign, and Partain did sign, a consultation request authorizing Addison Group to liquidate Partain's financial assets and transfer them to a brokerage account in California. Fenech advised Partain to liquidate her $82,000 Individual Retirement Account, $19,000 in General Electric stock, $42,000 in State Farm Insurance, and her Mobil Oil stock and to transfer the money to an annuity purchased from Sidney Mondschein, a financial planner in California known by Respondent.

Respondent was fully aware that Thomsen and Fenech attended the meetings with Partain, that Thomsen and Fenech solicited Partain to transfer assets, and that Thomsen and Fenech delivered legal documents and obtained execution of the trust and related documents. At no time did Respondent meet Partain.

## Complaint of Ina Grimes

John Karstetter, an ALMS client service representative, went to the home of Ina Grimes, a widow, 82 years of age who had responded to the unsolicited mailing of Respondent concerning es-

tate planning. Respondent's mailing did not state as required that it was "Advertising Material."

Karstetter advised Grimes regarding a trust and other estate planning instruments. Karstetter stated to Grimes that she could save $6,000 in probate costs. Karstetter recommended that Grimes engage Respondent to prepare the trust and other estate planning documents. Karstetter explained Respondent's document, Disclosure Statement and Agreement, and then had Grimes initial and sign the document. Grimes gave Karstetter a check in the amount of $1,995 made payable to Respondent.

At no time did Respondent personally meet or counsel Grimes as to her estate planning needs.

## Complaint of Marjorie Jennings

Jennings is a 72-year-old widow who lives in Wichita, Kansas. A client service representative, Jackson, made an unsolicited telephone call to Jennings and attempted to convince Jennings to permit Shawn Schoelen, another client service representative, to visit with her concerning wills, living trusts, and other legal matters. Jackson provided Jennnings with Respondent's telephone number. Jennings received an unsolicited mailing from Respondent concerning estate planning and the means to avoid probate. Respondent's mailing did not state as required "Advertising Material."

## Complaint of Camille Nohe

On May 25, 2000, Karstetter met with Virginia Jean King at her residence in Topeka, Kansas. King was 81 years of age, a widow, and visually impaired. King had responded to the unsolicited mailing of Respondent concerning estate planning for the purpose of avoiding probate. Respondent's mailing did not state as required "Advertising Material."

On May 25, 2000, Karstetter obtained King's signature on an engagement letter, provided advice and explanations of various legal instruments, reviewed her assets, and collected a check for $2,495 payable to Respondent.

On July 13, 2000, Respondent advised the office of the Disciplinary Administrator that he severed his relationship with ALMS

and would not accept any new clients through ALMS from that date. On August 7, 2000, Brad Toburen, a client service representative for Respondent, Advanced Legal Systems, and ALMS, brought to and reviewed with King a completed living will, pour-over will, revocable living trust, durable power of attorney for health care decisions, and a quitclaim deed on her home, which had been prepared by Respondent. Toburen represented to King that he was there so that she would execute and sign the trust and he would notarize it.

### Supplement to the Formal Complaint

Mary Lou Turpin, a widow, received an unsolicited mailing for estate planning services from Respondent and Advanced Legal Systems. On September 10, 1999, Thomsen, a client service representative, visited with Turpin at her home in Atchison, Kansas. Following the viewing of a videotape prepared by Respondent and a presentation by Thomsen explaining estate planning instruments, Turpin signed an engagement letter and gave Thomsen a check for $1,995 for Respondent's legal fees. Brenda Myers, a daughter of Turpin, was present with her mother on September 10, 1999, during the playing of Respondent's videotape and Thomsen's presentation.

In November of 1999, Turpin's health deteriorated, and she was hospitalized. Family members of Turpin called Respondent and Advanced Legal Systems and informed them of Turpin's hospitalization and declining health. James Parker, representing Respondent and Advanced Legal Systems, came to the hospital with a revocable living trust agreement, last will and testament, and business and health care powers of attorney forms. Because Turpin was incapacitated, Parker advised Myers that since she was going to have the power of attorney, she could execute and sign the legal documents on behalf of her mother. Myers signed the trust, will, and powers of attorney as Parker instructed. Respondent took no action to protect Turpin's legal interests as to her estate after being informed of her medical and mental disability.

Myers and her family retained Larry Mears, an attorney, to probate Turpin's estate. Mears, on behalf of Turpin's heirs, made a

demand for the return of $1,995 for legal fees and payment to cover the costs associated with the intestate probate of the estate. Respondent failed to respond to Mears' letter, failed to return the $1,995 to Turpin's estate, failed to assist in the probate of the estate, and failed to take steps to the extent reasonably practicable to protect Turpin's estate.

## Disciplinary Proceeding

At the hearing on this matter, Respondent stipulated to the facts and violations contained in the formal complaint and in the supplement to the formal complaint. Respondent, through counsel, requested that he be placed on probation. Respondent had previously provided a proposed probation plan to the hearing plan. The Deputy Disciplinary Administrator concurred with the recommendation for probation and requested that Respondent be publicly censured and placed on supervised probation.

We note that during the time the Respondent was associated with ALMS and associated companies, Respondent was covered under a professional liability insurance policy. The policy was issued by Interlex Insurance Company. Respondent continues to be covered under this policy. Respondent, ALMS, and its associated companies have made restitution to the following individuals in the following amounts and dates:

| | | |
|---|---|---|
| Margaret E. Barr | $2,495 | September 25, 2000 |
| Benny Gray | $2,495 | August 27, 2000 |
| Elizabeth Grice | $2,495 | November 22, 2000 |
| Leroy Higdon | $1,300 | September 9, 2000 |
| Jean King | $2,495 | August 15, 2000 |
| Herbert Markley | $2,495 | August 5, 2000 |
| Edward McGinness | $2,495 | July 26, 2000 |
| Bernard Oots | $1,250 | September 9, 2000 |
| J.E. Rogers | $1,250 | July 28, 2000 |
| Lindy Scheuerman | $2,495 | September 9, 2000 |
| Willis Smith | $2,495 | August 5, 2000 |
| Charles Sutton | $2,495 | August 27, 2000 |
| Mabell Toms | $2,495 | August 19, 2000 |
| Estate of Mary Lou Turpin | $1,995 | January 8, 2001 |

| William Weaver | $2,495 | September 9, 2000 |
| Leonard Werner | $2,495 | September 9, 2000 |

Throughout the disciplinary investigation and prosecution, Respondent fully cooperated with the disciplinary authorities.

## The Panel's Conclusions

KRPC 1.4(b) (2000 Kan. Ct. R. Annot. 320) provides that attorneys shall explain a matter to the extent reasonably necessary to permit clients to make informed decisions regarding the representation. The use of the word "shall" in the rule imposes a positive duty to communicate with clients. Neither providing a client with the attorney's telephone number so that the client may initiate a contact with the attorney nor a client's meeting with nonattorney staff from the attorney's office fulfills this duty, where the attorney has neither met with nor consulted with the client. An attorney must maintain a direct relationship with the client. See *State v. Barrett*, 207 Kan. 178, 184, 483 P.2d 1106 (1971). Because Respondent's clients received no explanation from Respondent about their estate plans based upon their individual circumstances, the panel concluded that Respondent violated KRPC 1.4(b).

KRPC 1.5(a) (2000 Kan. Ct. R. Annot. 330) requires that a lawyer's fees be reasonable. Based on Respondent's stipulation, the hearing panel concluded that the attorney fees charged by Respondent were unreasonable.

KRPC 1.14(a) (2000 Kan. Ct. R. Annot. 359) provides, in part, that when a client's ability to make considered decisions in connection with the representation is impaired, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client. Respondent knew that Turpin was impaired and he had a duty to maintain a normal client-lawyer relationship with her, meaning a duty to abide by her estate planning objectives as far as reasonably possible. Respondent violated KRPC 1.14(a) when he failed to implement Turpin's estate plan.

KRPC 1.15(b) (2000 Kan. Ct. R. Annot. 360) provides that upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third

person. Except as stated in the rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and shall promptly render a full accounting regarding the property. Because Respondent failed to promptly deliver to the estate of Turpin $1,995 that the estate was entitled to receive, the panel concluded that Respondent violated KRPC 1.15(b).

KRPC 1.16(d) (2000 Kan. Ct. R. Annot. 371) provides that upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests. Because Respondent failed to timely refund the $1,995 in attorney fees to Turpin's estate, the panel concluded that he violated KRPC 1.16(d).

KRPC 5.3 (2000 Kan. Ct. R. Annot. 404) provides, in part:

"With respect to a nonlawyer employed or retained by or associated with a lawyer:

. . . .

"(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

"(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the rules of professional conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action."

The panel recognized that attorneys often delegate certain tasks to nonlawyers. "Such delegation is proper if the lawyer maintains a direct relationship with his client, supervises the delegated work, and has complete professional responsibility for the work product." 207 Kan. at 184. The panel noted that the comment to KRPC 5.3 provides:

"Lawyers generally employ assistants in their practice, including secretaries, investigators, law student interns, and paraprofessionals. Such assistants, whether employees or independent contractors, act for the lawyer in rendition of the law-

yer's professional services. *A lawyer should give such assistants appropriate instruction and supervision concerning the ethical aspects of their employment*, particularly regarding the obligation not to disclose information relating to representation of the client and should be responsible for their work product. *The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline."* (Emphasis added.)

The panel concluded that Respondent violated KRPC 5.3(b) and KRPC 5.3(c) when he failed to properly supervise the client service representatives and when he failed to assure that the actions of the client service representatives were compatible with his professional obligations as a lawyer.

KRPC 5.4(a) (2000 Kan. Ct. R. Annot. 405) prohibits attorneys from sharing legal fees with a nonlawyer. In analyzing the reason for this prohibition, the panel quoted *Commission on Professional Ethics v. Lawler*, 342 N.W.2d 486, 488 (Iowa 1984), where the Iowa Supreme Court stated:

"A rationale advanced for the prohibition against sharing fees with laypersons, beyond the obvious observation that fee splitting encourages laypersons to practice law, has been stated as follows:

" 'The underlying purpose of regulating the practice of law is not so much to protect the public from having to pay fees to unqualified legal advisors as it is *to protect the public against the often drastic and far reaching consequences of their inexpert legal advice.*' " (Quoting *In re Baker.* 8 N.J. 321, 339, 85 A.2d 505 [1951].)

Here, Respondent received $250 of the $1,995 or $2,495 collected for attorney fees. Accordingly, the panel concluded that Respondent violated KRPC 5.4(a) when he shared legal fees with the client service representatives, ALMS, and associated companies.

KRPC 5.5(b) (2000 Kan. Ct. R. Annot. 406) provides that attorneys shall not assist nonlawyers in the unauthorized practice of law. The Kansas Supreme Court has the inherent power to define and regulate the practice of law. What constitutes the unauthorized practice of law is determined on a case-by-case basis. *State ex rel. Stephan v. Williams*, 246 Kan. 681, 689, 793 P.2d 234 (1990). This court has repeatedly recognized the actions of counseling and advising clients on their legal rights and rendering services requiring knowledge of legal principles are included within the definition of practicing law. *State ex rel. Stovall v. Martinez*, 27 Kan. App. 2d 9,

11-12, 996 P.2d 371 (2000). The client service representatives engaged in the unauthorized practice of law because their activities involved counseling and advising clients on their legal rights and rendering services requiring knowledge of legal principles. Therefore, the panel concluded that Respondent assisted the client service representatives in the unauthorized practice of law in violation of KRPC 5.5(b).

KRPC 7.3(b) (2000 Kan. Ct. R. Annot. 412) provides, in part, that a lawyer shall not solicit professional employment from a prospective client by written or recorded communication or by in-person or telephone contact even when not otherwise specifically prohibited in the Rules if the prospective client has made known to the lawyer a desire not to be solicited by the lawyer or the solicitation involves coercion, duress, or harassment. Subsection (c) of KRPC 7.3 provides that every written communication from a lawyer soliciting professional employment from a prospective client known to be in need of legal service in a particular matter and with whom the lawyer has not family or prior professional relationship shall include the words "Advertising Material" on the outside envelope and at the beginning and ending of any recorded communication. The panel concluded that Respondent violated KRPC 7.3(b) because the solicitations were targeted at the elderly population. Additionally, the panel concluded that Respondent violated KRPC 7.3(c' 'en he failed to include the words "Advertising Material" on t\ utside envelope of the mailings.

KRPC 8.4(c) (20\ Kan. Ct. R. Annot. 420) provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. Subsection (d) of KRPC 8.4 states that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice, and subsection (g) provides that it is misconduct for a lawyer to engage in any other conduct that adversely reflects on the lawyer's fitness to practice law. Here, the panel concluded that Respondent violated KRPC 8.4(c) when he became associated with the fraudulent activities of ALMS. The panel concluded that Respondent violated KRPC 8.4(d) when he failed to assist in the probate of Turpin's estate and that he violated KRPC 8.4(g) when he

allowed the client service representatives to use his name to give credibility to the fraudulent activities of ALMS and associated companies.

Based on the stipulated evidence, the panel concluded that Respondent engaged in misconduct in violation of KRPC 1.4(b) (2000 Kan. Ct. R. Annot. 320) (communication); KRPC 1.5(a) (2000 Kan. Ct. R. Annot. 330) (fees); KRPC 1.14(a) (2000 Kan. Ct. R. Annot. 359) (client under a disability); KRPC 1.15(b) (2000 Kan. Ct. R. Annot. 360) (safekeeping property); KRPC 1.16(d) (2000 Kan. Ct. R. Annot. 371) (terminating representation), KRPC 5.3(b) and (c)(2000 Kan. Ct. R. Annot. 404) (responsibilities regarding nonlawyer assistants); KRPC 5.4 (2000 Kan. Ct. R. Annot. 405) (professional independence); KRPC 5.5(b) (2000 Kan. Ct. R. Annot. 406) (unauthorized practice of law); KRPC 7.3(b) and (c) (2000 Kan. Ct. R. Annot. 412) (direct contact with prospective clients); and KRPC 8.4(c), (d), and (g)(2000 Kan. Ct. R. Annot. 420) (misconduct).

## The Panel's Recommendations

The panel, in a well-reasoned and articulate opinion, set forth its reasons for recommending probation as the appropriate discipline for Respondent. The panel found that this case epitomizes the pitfalls inherently involved when attorneys associate themselves with for-profit companies which solicit legal business and use nonlawyer personnel to perform client interviews and counseling. For example, an attorney in *In re Thrasher*, 661 N.E.2d 546 (Ind. 1996), was suspended from the practice of law after becoming involved in a similar situation in the area of bankruptcy practice. Under the arrangement in *Thrasher*, nonlawyers met with clients and prepared bankruptcy petitions, which were signed by the attorney even though the attorney had not consulted with the clients. The *Thrasher* court provided a helpful description of the problems involved in these types of associations:

"The respondent appeared in a case as counsel of record when, in fact, a nonlawyer provided all legal advice to the client, drafted the pleadings, and collected the fee. The respondent's signature on the bankruptcy petition was a complete sham, apparently intended only to serve as the affirmation needed to get the bankruptcy

court to accept the pleadings. That the respondent may have intended to actually provide representation to the client at some point after the petition was filed is irrelevant. The risks inherent in arrangements such as this one could not be more clearly illustrated than by the events that later unfolded in this case. The client received incompetent legal representation that threatened complete destruction of his cause of action. The respondent ultimately found himself faced with monetary sanctions and a disciplinary action. The bankruptcy court was needlessly burdened with nonmeritorious pleadings. It is essential to the integrity of any legal practice that lawyers maintain independent professional judgment and not fully abdicate the responsibility of providing legal advice, guidance and expertise to nonlawyers. For the protection of the public and the profession, the privilege of providing legal services to others is entrusted only to those who are duly licensed to practice law." 661 N.E.2d at 549.

Here, the panel noted that the ALMS materials reflect consciousness of ethical standards and seek to avoid violations through client disclosures and consents. For example, the agreement entitled "Disclosure Statement and Agreement" advises that the "Client Service Representative is not a licensed attorney and all questions related to your estate planning options should be directed to the attorney." Also, in the same agreement, the client is asked to initial the statement "the Client understands that the Client Service Representative has not and will not provide legal or tax advice." The foregoing and similar disclosures and consents do not relieve an attorney from his or her duties to abide by the applicable rules of professional conduct.

In making recommendations for discipline, the panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (1991). Pursuant to Standard 3, the panel considered the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

*Duty Violated.* Respondent violated duties to his clients, to the legal profession, and to the public.

*Mental State.* Respondent knowingly violated his duties to his clients, to the legal profession, and to the public.

*Injury.* The Respondent's clients and the legal profession suffered actual injury as a result of Respondent's misconduct.

*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the panel found the following aggravating factors present: (1) Respondent engaged in a pattern of misconduct by failing to communicate with numerous clients and by failing to adequately supervise nonlawyers on a number of occasions. (2) Respondent violated multiple Rules. (3) Respondent's clients were elderly widowed women who were particularly vulnerable to the misconduct in this case.

Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the panel found the following mitigating circumstances: (1) Respondent has not previously been disciplined. (2) Respondent has paid over $30,000 in restitution as of the date of the hearing. Although Respondent offered to make restitution to the estate of Turpin on January 28, 2000, the payment was not forthcoming until January 8, 2001. The panel found, in regard to the estate of Turpin, the restitution was not timely made. However, in each of the other cases, the panel found that the restitution was timely made. (3) Throughout the disciplinary investigation and prosecution, Respondent fully cooperated with the disciplinary authorities. (4) Respondent was admitted to the practice of law in 1995. As such, at the time the misconduct occurred, Respondent had been practicing law for approximately 4 years. (5) The letters submitted by Respondent from his friends and colleagues indicate that Respondent enjoys a good reputation in his community.

In addition to the previously cited factors, the panel thoroughly examined and considered Standard 5.13, which provides, in part: "Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law."

The panel found that the misconduct of Respondent was serious and that the Standards would support the suspension of Respondent from the practice of law for a period of time. However, be-

cause Respondent had ceased his affiliation with ALMS and associated companies and because of the mitigating factors found, the panel determined that suspension was not warranted.

At the hearing, the panel reviewed Respondent's proposed plan of probation. The panel requested that the parties make certain additions and modifications to the plan of probation. Thereafter, on February 12, 2001, with the approval of the Deputy Disciplinary Administrator, Respondent provided the panel with an amended proposed probation plan. After considering the amended proposed probation plan, the panel unanimously recommended to this court, in accordance with the Deputy Disciplinary Administrator's recommendation, that Respondent be publicly censured and be permitted to continue to practice law, subject to certain terms and conditions of supervised probation.

After this case was set on this court's docket, the Disciplinary Administrator revised the recommendation for discipline because on April 11, 2001, a subsequent complaint was filed with the office of the Disciplinary Administrator alleging that Respondent engaged in conduct similar to the conduct which provided the basis of the formal complaint. If the allegations are true, the conduct of Respondent would also be in violation of the terms and conditions of Respondent's proposed plan of probation. On July 13, 2001, the Review Committee of the Kansas Board for Discipline for Attorneys found sufficient evidence to support a finding of probable cause for violations of the Kansas Rules of Professional Conduct in the additional complaint, which involves allegations of misconduct filed by Mary Donnell-Brown.

## Complaint of Donnell-Brown

Donnell-Brown alleged that her parents, Wilbert and Ruby Luetjen, received an unsolicited mailing to attend an "Estate Planning Workshop" on April 4, 2001, conducted by CLA USA in Warsaw, Missouri. As a result of attending the workshop, Dennis P. Huff, Account Representative for CLA USA met later the same day with her and her parents at the Luetjen residence. At the meeting, Huff provided the business card of Respondent to the Luetjens, advising them that Respondent would be the lawyer to prepare their trust

documents. The mailing from CLA USA that the Luetjens responded to did not indicate that it came from an attorney.

Donnell-Brown claims that Huff pressured her parents to make a decision that CLA USA would "take care of everything without her parents having to meet with an attorney." Also, according to Donnell-Brown, Huff provided advice to the Luetjens concerning trust instruments and the means to avoid estate taxes and probate. Huff further informed the Luetjens that Respondent would prepare the trust documents, but that it was not necessary for them to meet with him. Respondent has never met or talked with the Luetjens.

The Disciplinary Administrator withdrew its support of Respondent's 2-year plan of supervised probation. The revised recommendation of the Disciplinary Administrator was that Respondent receive the sanctions of 1-year suspension from the practice of law and published censure.

On September 5, 2001, prior to oral argument, Respondent and the Disciplinary Administrator amended their recommendations to this court based on additional information provided by Respondent. The parties recommended that Respondent be suspended from the practice of law for a period of 6 months and Respondent be placed on a 2-year period of supervised probation upon Respondent's reinstatement to practice law.

Recommendations as to the type of discipline from either a hearing panel or the Disciplinary Administrator are advisory only, and this court may impose a greater or lesser sanction as deemed appropriate. Kan. Sup. Ct. Rule 212(f) (2000 Kan. Sup. Ct. R. Annot. 254).

DISCIPLINE IMPOSED:

The court, having considered the record herein and reports of the hearing panel, concurs in the findings, conclusions, and recommendation of the panel.

IT IS THEREFORE ORDERED that imposition of discipline against Respondent, Stephen Paul Flack, be suspended and that he be placed on probation for a period of 2 years from this date on the terms and conditions hereinafter set out:

1. Respondent shall not associate with ALMS or associated businesses.

2. Within 60 days of the final hearing report , Respondent shall contact all clients who engaged his legal services though ALMS or associated businesses and who paid Respondent attorney fees. Respondent shall notify each of these clients that Respondent is no longer affiliated with ALMS or associated companies. If the clients desire, Respondent shall (1) determine whether the clients received appropriate representation, (2) return the attorney fees paid, and (3) provide appropriate representation.

3. Respondent shall timely and appropriately respond to requests for restitution made by clients obtained through ALMS and associated companies. Restitution may include return of attorney fees paid as well as payment for any injuries suffered as a result of Respondent's association with ALMS or associated companies.

4. Respondent shall continue to maintain professional liability insurance.

5. In addition to the standard requirement of 12 continuing legal education hours, Respondent shall successfully complete the New Lawyer Practical Skills Program developed pursuant to Kansas Supreme Court Rule 802A (2000 Kan. Ct. R. Annot. 540) during the first year of Respondent's probation.

6. Respondent shall refrain from violating the Kansas Rules of Professional Conduct.

7. Respondent shall be supervised by William G. Hammond, a duly licensed Kansas attorney. While serving as Respondent's supervising attorney, Mr. Hammond shall act as an agent of the court and, accordingly, be afforded the immunities granted by Rule 223 (2000 Kan. Ct. R. Annot. 283). Mr. Hammond shall meet with Respondent biweekly. Mr. Hammond shall have access to Respondent's files, employees, and trust account. Mr. Hammond shall monitor the following: (1) whether Respondent continues to refrain from associating with ALMS and associated companies, (2) whether Respondent contacted each client obtained through ALMS and associated companies, informed them that he is no longer associated with ALMS and associated companies, and offered to determine whether the clients received appropriate representation, offered to return the attorney fees paid, and offered to provide appropriate representation, (3) whether Respondent has timely and appropriately responded to requests for restitution from clients obtained through ALMS and associated companies, (4) whether Respondent has current professional liability insurance, (5) whether Respondent has successfully completed the New Lawyer Practical Skills Program developed pursuant to Rule 802A, and (6) whether Respondent has engaged in violations of the Kansas Rules of Professional Conduct. Mr. Hammond shall report to the Disciplinary Administrator on a quarterly basis regarding the items listed above. Mr. Hammond shall immediately report any material deviation from proper practice to the Disciplinary Administrator.

IT IS FURTHER ORDERED that costs are to be assessed against Respondent in the amount certified by the office of the Disciplinary Administrator.

IT IS FURTHER ORDERED that if Respondent fails to abide by the conditions set forth herein, a show cause order shall issue to Respondent, and we will take whatever disciplinary action appears just and proper without further formal proceedings.

IT IS FURTHER ORDERED that this order be published in the official Kansas Reports and that costs herein be assessed to Respondent.